THE PEOPLE *ex rel.* Kipp and others *vs.* FINGER and others, commissioners of highways of the town of Livingston.

Where the legislature passed an act requiring commissioners of highways to build a bridge over a creek, "*upon* or *near* the site" of the old bridge which had been erected upon, and in connection with, a public highway; the object of the legislature being to have the bridge re-constructed, so that travel upon the road might be resumed; and a majority of the commissioners, under the authority given them by the act, to fix the site of the new bridge, left the highway, and passing up the stream more than a quarter of a mile, away from any public highway, assumed to locate the site of such new bridge, at a point upon the lands of private individuals, and without their consent, involving an additional expense for right of way; *it was held* that the commissioners went beyond the power conferred upon them by the legislature; and that a mandamus, directing them to proceed and erect the bridge upon the site thus selected, could not be issued. WRIGHT, J., dissented.

*Held, further,* that the statute authorizing the erection of the bridge, not having directed that the land of individuals should be taken for that purpose, and no intention of the kind being evinced, and no provision made for compensation to land owners, the commissioners had no authority to take private property, to enable them to build the bridge.

Where an alternative mandamus is issued, and the defendants make their return, and the relators, instead of demurring thereto, plead, taking issue upon all the material allegations in the return, they thereby admit that, upon its face, the return is a sufficient answer to the case made by the alternative writ. And if no material fact stated in the return is disproved upon the trial, the defendants will be entitled to a verdict in their favor.

APPEAL from a judgment at special term directing that a peremptory mandamus issue. By an act of the legislature, entitled "An act to provide for building a bridge over the Roeliff Jansen's kill, in the town of Livingston, in the county of Columbia, and for the payment of the expenses thereof," passed April 5, 1853, (*Laws of* 1853, *p.* 198,) the commissioners of highways of the town of Livingston were required to build a bridge over the Roeliff Jansen's kill, *upon or near the site of the old bridge* over said kill, near where the block factory stood in said town, and for such purpose were authorized to borrow money, &c. The commissioners were also required to give notice in writing to the commissioners of highways of each of the towns of Clermont and Germantown to meet with them at the

house of Jacob I. Cole, in said town of Livingston, on some day before the first day of May, to determine on the site for building said bridge, which site, it was declared, might be fixed by the commissioners of highways of any two of said towns.    Pursuant to this requirement, and notice for that purpose duly given, the commissioners of the three towns met at the place mentioned in the act, on the 30th of April 1853, and by the vote of the commissioners of Clermont and Germantown, determined that the site of the new bridge, should be "*at a place further up the creek, at a place known as the big rock, being a point at or near the south termination of a line fence between Alexander Crofts and Christian Cooper's lands, in the town of Livingston.*" The commissioners of Livingston protested against the location of the site at big rock, "as contrary to the spirit of the statute touching the site of the bridge." The commissioners of Livingston having refused to proceed to build a bridge at the site which had thus been fixed, a writ of *alternative mandamus* was, upon the application of the relators, issued against them, on the 31st of August, 1853, requiring them immediately to take the necessary steps provided in the act for building the bridge, or shew cause to the contrary on the second Tuesday of September.    To this writ the defendants returned that they had offered and proposed, in good faith, to carry out the provisions of the act by erecting a bridge in the place where the former bridge had stood, *or so near thereto as to accommodate the travel upon the existing public highway, on both sides of the stream;* that the site of the old bridge is distant seven rods easterly of the block factory, upon a public highway leading from the towns of Clermont and Germantown to Catskill and Hudson; that the place fixed by the commissioners of Clermont and Germantown, as the location of the bridge to be erected, is distant in a direct line up said stream, easterly from the location of the old bridge, one hundred and twelve rods, and that there is no public highway laid out to the proposed location; that from the new site to the nearest point of the public highway in the town of Livingston, is 146 rods, across improved and cultivated lands, the owners of which are .

opposed to the laying out of a highway across their lands, which are valuable, and that such highway, if established, would subject the town of Livingston to seven or eight hundred dollars additional expense.

The relators, by plea, denied severally all the statements in the return. The issues thus joined were tried before Mr. Justice WRIGHT, at the Columbia circuit, in January 1854, without a jury. On the trial, it was proved that on what was known as the river road, leading from the towns of Clermont and Germantown to Catskill and Hudson, there had been a bridge across the Roeliff Jansen's kill. This bridge was located some seven rods from the block factory, and had been swept away about two years before. It was 115 feet in length across the stream, and was what was called, by the parties, the old site. It was within a quarter of a mile of the Hudson river. The site selected on the 30th of April, at the point known as the big rock, is from 87½ to 112 rods up stream from the old site, and almost half a mile from the Hudson river. At this point, the stream is about 80 feet wide. The kill divides the towns of Livingston and Clermont, and on the Livingston side there is a rock formation at the new site.

At the new site, on the Clermont side, the lands are in possession of and owned by Jacob P. Miller, who was an applicant for the new bridge, and one of the relators. On the 4th of May, 1853, the commissioners of Clermont laid out a road from the point opposite the big rock, down the stream on the south bank thereof, through the lands of Miller, and connecting with the highway leading to the old site. This was done with the consent of Miller. The order of the commissioners was filed on the 8th of May. On the Livingston side of the creek the lands, to within eight or ten feet of the site, are enclosed and improved, and in the possession of Alexander Crofts and Christian Cooper. Crofts' exterior fence runs within some ten feet of the big rock. Outside of that fence there is no improvement. Some years since, and before the old bridge was erected, the road crossed the stream above the block factory, and the fording place on the Livingston side was about

three rods below the big rock, and from that point the road was continued in the town of Livingston and across the lands of Crofts, now enclosed. This road was attempted to be discontinued about the year 1838. An order was made by two commissioners of the town of Livingston, discontinuing the road, the order not showing upon its face that all the commissioners were notified of the meeting at which it was made. The road has been fenced in some 12 or 15 years. Upon these facts an order was made that a peremptory mandamus issue, and judgment was rendered against the defendants for costs. From this order and judgment the defendants appealed to the general term.

*H. Hogeboom,* for the relators.

*K. Miller,* for the defendants.

HARRIS, J. The mandate of the legislature is, that the commissioners of highways of the town of Livingston shall build a bridge over the Roeliff Jansen's kill, *upon or near the site of the old bridge.* But there may have been more than one old bridge over the kill. The act itself speaks of another bridge over the same stream, known as the Blue Store Bridge. That is not the bridge intended. It is where a bridge once stood in the neighborhood of the old block factory. It is thus the legislature indicate the bridge they design to have rebuilt. It is to be built "upon or near the site of the old bridge," which is "near where the block factory stood."

The object of the legislature in imposing this burden upon the towns which are required to contribute to the expense of the bridge, is apparent. There is a public highway leading north from the towns of Clermont and Germantown to Catskill and Hudson. Upon this highway a bridge had been erected over the Roeliff Jansen's kill. That bridge had been carried away, and thus the travel upon that road had been interrupted. The object of the legislature was to have the bridge re-constructed, so that travel upon the road might be resumed. The commissioners are therefore required to build a bridge " *upon*

*or near the site of the old bridge.*" The rebuilding of the bridge was required for the accommodation of that portion of the public which might have occasion to travel upon that road. It was for this purpose that the legislature thought fit to direct the expenditure. The bridge was to be built in connection with, and to become a part of, the highway—a well-known and public thoroughfare.

There is no reason to suppose that the legislature intended that the line of the road should be changed. Certainly the act contains no authority to that effect. Nothing else seems to have been contemplated than the reconstruction of the bridge upon the line of the road as it then existed. And yet, I am not prepared to say, that had the proper authorities on each side of the stream seen fit to alter the line of the road, at the point of crossing, the site of the bridge would not have gone with the road. I am inclined to think it would. Though this was not the thing before the mind of the legislature, it would have given effect to the legislative intent. It would have provided for the travel upon the road. But even if the line of the road should not be changed, it might not be desirable to construct the bridge precisely upon the site of the old bridge. Within the limits of the road itself one point might be more eligible than another. A joint meeting of the commissioners of the three towns was therefore provided for, in the act, to determine upon the site. At this meeting, the commissioners of two towns " voted for a site at a place further up the creek, at a place known as the big rock, being a point at or near the south termination of a line fence between Alexander Crofts and Christian Cooper's lands." Against this the commissioners of Livingston protested, as contrary to the spirit of the act. Thus, the majority of the commissioners, under the authority given them by the act to fix the site of the new bridge, have left the road, for, and as a part of which, the bridge was to be built, and passing up the stream more than a quarter of a mile, away from any public highway whatever, have assumed to locate the site of the new bridge at a place known as the big rock, upon the

lands of private individuals, and without their consent. In doing this, I think they went beyond the power conferred upon them by the legislature.

It is claimed that the legislature, by requiring the bridge to be built " upon or *near* the site of the old bridge," and then authorizing the commissioners of the three towns, or a majority of them, to fix the site, has manifested an intention to endow the commissioners with a discretion sufficiently broad to cover what they have done. But I cannot assent to this latitude of construction. The word " near," which the legislature has employed in connection with the site of the new bridge, may be used as an incident to either time or space. In either case, it is used relatively, with reference to the subject to which it is applied. What would be *near*, in one case, would *not be near*, in another. In *The People* v. *Denslow*, (1 *Caines*, 177,) it was thought that a statute requiring a turnpike company to erect their gate near John Van Hoesen's house, had been complied with by erecting the gate within 33 rods of the house. On the contrary, in *Griffen* v. *House*, (18 *John.* 397,) where a turnpike company, with a road about 20 miles in length, were required to locate their easterly gate at such a place *near* the Massachusetts line as the president and directors should *direct*, it was held that a gate two miles and three quarters from the line, was too far off to be " near." In this very case, while the commissioners of Clermont and Germantown felt themselves at liberty to locate the new site at the big rock, because though distant more than a quarter of a mile, it was *near* the old site, they have themselves determined that the new bridge shall be built " at a point at or *near* the south termination of a certain line fence." Now, it is but a little more than a quarter of a mile from the south termination of the fence, at or *near* which the commissioners have determined that the new bridge shall be built, to the site of the old bridge. Certainly the site of the old bridge is just as near to the point selected by the commissioners as the termination of the fence designated, is to the site of the old bridge. Why, then, may not the commissioners of Livingston proceed to build their bridge upon the old site,

The People v. Finger.

assuming that it is sufficiently near to the point mentioned in the location to answer the terms used by the commissioners to designate the new site? No one would pretend that this could be done, for the reason that it is obvious that no such thing was intended. We readily see from the circumstances, that the commissioners, who exercised the power of determining the site, meant that the new bridge should be built, not at the old site, but at some point *very near* to the south termination of the fence at the big rock. By the same mode of reasoning, I am led to the conclusion that the legislature intended that the new bridge, whether built upon or *near* the site of the old bridge, should be built upon the line of the road leading from Clermont and Germantown to Catskill and Hudson; and that, in attempting to have it built away from that road, in the expectation, perhaps, that the public would by some means have the road brought to the bridge, the commissioners went beyond their power.

But again, the land upon which the new bridge is to be built, according to the determination of the commissioners, is private property. The bed of the stream is not less so than the land upon the shore. The public have done nothing to acquire a right of property in, or even a right to use this land. The subsequent effort of the commissioners of Clermont to provide a remedy for this difficulty, by laying out a road along the southerly margin of the stream from the road to the new site, was entirely abortive. The difficulty still exists. The land upon which the new bridge is to be built is private property. The legislature has not directed it to be taken, and no authority having jurisdiction for that purpose has taken it for any public use. I confess, therefore, that I am unable to see why the commissioners who should undertake to build a bridge upon this new site, would not, the moment they should enter upon the land where it is to be built, and as often as they should do so, make themselves trespassers. I do not, of course, deny the power of the legislature to direct that land be taken for a bridge, as well as for a rail road or a canal; but the difficulty in the

case is, that the legislature has evinced no intention to have this done, and no provision has been made for compensation to the owner, without which even the legislature could not take it.

There is another feature of this case which, though not noticed upon the argument, seems to me to deserve a passing notice. A writ of alternative mandamus was served upon the defendants, to which they made their return. To this return the relators were at liberty either to demur or to plead. They elected to plead, and by their plea took issue upon all the material allegations in the return. For the determination of this issue, the statute provides that the like proceedings shall be had, as might have been had if the relators had brought an action on the case against the defendants for a false return, and that in case a verdict be found in favor of the relators, they should recover damages and costs, in like manner as if it had been an action on the case. The trial of the issue between the parties, therefore, is to be regarded as the trial of an action against the defendants for a false return. Of course the relators hold the affirmative of the issues. The return is to be taken as true, until it is falsified upon the trial.

In this case the trial was had without a jury. The facts found by the judge are substantially the same as those stated in the return. Not a single allegation upon which the relators have taken issue, has been disproved. Had the trial been before a jury, their verdict must have been for the defendants. And yet the same judgment has been rendered against the defendants, as if there had been a verdict against them. Not only has a peremptory mandamus been awarded, but a judgment has been rendered against them for costs, to the amount of $152.78. This, I think, was erroneous. By pleading to the return, the relators admitted that, upon its face, it was a sufficient answer to the case made by the alternative writ. No material fact stated in the return having been disproved upon the trial, the defendants were entitled to a verdict in their favor, and of course to judgment.

I am of opinion, therefore, that the judgment ought to be reversed, and that, upon the whole record, the defendants are entitled to judgment.

WATSON, J., concurred.

WRIGHT, J., dissented.

Judgment for defendants.

[ALBANY GENERAL TERM, December 4, 1854. *Wright, Harris* and *Watson,* Justices.]