On the Merits.
Manning, C. J.
The relator is an Israelite, and was a member of the Congregation of the Dispersed of Judah, a corporation organized and chartered under the laws of this State. On J une 13,1877, he was ■expelled therefrom,.he alleges illegally and arbitrarily, and now prays that a writ of mandamus be directed to the officers of the corporation, compelling them to restore him to his rights and privileges of membership.
The answer admits the membership of the relator prior to the date mentioned, and avers that on that day, at a meeting of the Congregation, there being present a legal quorum thereof, certain charges were preferred against him of gross misconduct, upon which testimony was received, and of which he was found guilty, and was thereupon expelled by a vote of three fourths of the members present, which mode of proceeding, it is averred, is in accordance with the constitution and laws of the Congregation. The Respondent then pleads to the jurisdiction of the court, averring that such expulsion is wholly within the cognizance of the ecclesiastical tribunal, provided by the corporation of which he was a member, and that the civil courts have no authority to inquire into, or revise the same.
The correctness of this return to the alternative writ is verified by the oath of the President of the Congregation, and was not traversed by the relator, nor was any proof offered to impugn its truth. The case therefore presents the naked question, whether the civil courts can or will revise the ordinary acts of church discipline, or the administration of 'church government.
The entire separation of Church and State is not the least of the evidences of the wisdom and forethought of those who made our national constitution. It was more than a happy thought — it was. an inspiration. But although the state has renounced all authority to control the internal management of any church, and refuses to prescribe any form of church government, it is nevertheless true that the law recognizes the existence of churches, and protects and assures their right to exist, and to possess and enjoy their powers and privileges. Of *207 course wherever rights of property are invacled, the law must interpose equally in those instances where the dispute is as to church property as in those where it is not, and it also takes note of, but does not itself enforce, the discipline of the church, and the maintenance of church order and internal regulation. The law does not assume, and. will not declare, that a particular religious association is more truly the church than another, but each and all of them are permittéd to make their own regulations, and to enforce them in the manner each has provided for itself.
This whole subject was maturely considered and elaborately expounded in Watson v. Jones, 13 Wall. 679, where the court say ; — In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious- unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognisance, subject only to such appeals as the organism itself provides for, p. 728.
The court refer in that opinion to Harmon v. Dreher, 2 Speer’s Eq. 87 (S. C.) as one of the most careful and well considered judgments upon the subject, in which it is said ; — It belongs not to the civil power to enter into or review the proceedings of a spiritual court. The structure of our government has, for the preservation of civil liberty, rescued the temporal institutions from religious interference. On the other hand, it has secured religiousdiberty from the invasion of the civil authority. The judgments, therefore, of religious associations, bearing on their own members, are not examinable here and I am not to inquire whether the doctrines attributed to Mr. Dreher were held by him, or whether, if held, were a'nti-Lutheran; or whether his conduct was or was not in accordance with the duty he owed to the Synod or to his denomination. * * * - When a civil right depends upon an ecclesiastical *208 matter, it is the civil court aud not the ecclesiastical which is to decide. But the civil tribunal tries the civil right and no more, taking the ecclesiastical decisions out of which the civil right arises as it finds them.
So too in Missouri in the State ex rel. Watson v. Farris — it was said, the utter impolicy of the civil courts attempting to interfere in determining matters which have been passed upon in church tribunals, arising out of ecclesiastical concerns, is apparent. It would involve them in difficulties and contentions, and impose upon them duties which are not in harmony with their proper functions. Before' a court could give an enlightened judgment, it would be necessary to explore the whole range of the doctrine and discipline of the given church and survey the vast field of the divine word.
And in Kentucky the binding force and completeness of the church’s action is thus stated ; — Every person entering into the church, impliedly at least, if not expressly, covenants to conform to the rules of the church, to submit to its authority and discipline. Appellant when he became a member thereof placed himself in this condition. * * * Whether in what the church did it acted right or wrong, this court cannot approach its precincts to inquire, and is powerless to redress any wrong inflicted on appellant thereby. By becoming a member of the church he subjected himself to its ecclesiastical power, and neither this nor- any other earthly tribunal can supervise or control that jurisdiction. Lucas v. Case, 9 Bush, 297.
And finally the rule is enunciated by an approved modern writer thus ;-^The principle may now be regarded as too well established to admit of controversy, that in the case of a religious congregation or an ecclesiastical body, which is itself but a subordinate member of some ■general church organization, having a supreme ecclesiastical judicatory over the entire membership of the organization, the civil tribunals must accept the decisions of such church judicatory as final and conclusive upon all questions of faith, discipline, or ecclesiastical rule, and the party aggrieved cannot invoke the aid of the civil courts to have such proceedings reversed. High on Injunctions, sec. 233.
One of the allegations of the petition is that by the expulsion of the relator from the congregation, the right to be buried in its burying-ground will be, or is denied him, and the celebrated case of Guibord is cited as an instance where the civil courts took cognizance of the refusal of sepulture by the ecclesiastical authorities, and enforced the party’s right to burial in consecrated ground. The final decision of that case was by the Judicial Committee of the Privy Council in England, and courts there go much further than they would do here in enforcing rights appertaining to, or growing out of, ecclesiastical matters. But it is sufficient to say, in disposing of this part -of the complaint, that *209 Guibord was dead, and the object of the proceeding in his case was to procure the interment of his body in that part of the Montreal cemetery which was consecrated, whereas the relator has happily no present need of enforcing his claim to burial anywhere, and non constat that before he does need it, he will have his ban of excommunication removed, and be restored to full fellowship in the congregation.
It sufficiently appears from what has now been said that we think the relator’s demand cannot be enforced by the civil courts. The return or answer to the alternative wiit set up as grounds why the peremptory writ should not issue that the relator had been excommunicated according to the rules adopted and in force in the congregation from which he was expelled, and the by-laws in evidence shew what these rules were. The judicatory provided by those laws has acted upon the matter, and we cannot go behind its action to inquire whether it acted rightly or wrongfully, justly or unjustly. It is the tribunal to which he submitted himself when he accepted membership of the congregation, and its action is not examinable in a civil court.
It will be observed that we assume, as we are obliged to do in the state of the pleadings and evidence in this case, that the church judicatory was properly constituted, and in the manner prescribed by the constitution and by-laws of the congregation. The return, not having been traversed by proof, nor excepted to for insufficiency, is taken as true for the purpose of testing the right to the peremptory mandamus, and that return avers and exhibits the constitution of the body which forms the judicatory, and which passed the sentence of excommunication. The State ex rel. Vierra v. Lusitanian Society, 15 Annual, 73. Tucker v. the Justices, 1 Jones (N. C.) 451. People v. Finqu, 24 Barb. 341.
The judgment of the lower court sustained the exception to the jurisdiction, and refused the peremptory mandamus. It is correct and is affirmed.