Mr. Justice MILLER
now delivered the opinion of the court.
This case belongs to a class, happily rare in our courts, in-which one of the parties to a controversy, essentially ecclesiastical, resorts to the judicial tribunals of the State for the maintenance of rights which the church has refused to acknowledge, or found itself unable to protect. Much as such dissensions among the members of a religious society should *714 be regretted, a regret which is increased when passing from the control of the judicial and legislative bodies of the entire organization to which the society belongs, an appeal is made to the secular authority; the courts when so called on must perform their functions as in other cases.
Religions organizations come before us in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints. Conscious as we may be of the excited feeling engendered by this controversy, and of the extent to which it has agitated the intelligent and pious body of Christians in whose bosom it originated, we enter upon its consideration with the satisfaction of knowing that the principles on which we are to decide so much of it as is proper for our decision, are those applicable alike to all of its class, and that our duty is the simple one of applying those principles to the facts before us.
The first of the points arising in the case concerns the jurisdiction of the Circuit Court, which is denied; first, on the ground that the plaintiffs have no such interest in the subject of litigation as will enable them to maintain the suit, and, secondly, on matters arising out of the alleged proceedings in the suit in the Chancery Court of Louisville.
The allegation that the plaintiffs are not lawful members of the Walnut Street Church is based, upon the assumption that their admission as members was by a pastor and elders who had no lawful authority to act as such. As the claim of those elders to be such is one of the matters which this bill is brought to establish, and the denial of which makes an issue to be tried, it is obvious that the objection to the interest of the plaintiffs must stand or fall with the decision on the merits, and cannot be decided as a preliminary question. Their right'to have this question decided, if there is nc other objection to the jurisdiction, cannot be doubted. Some attempt is made in the answer to question the good faith of their citizenship, but this seems to have been abandoned in the argument.
*715 In regard to the suit in the Chancery Court of Louisville, which the defendants allege to be pending, there can be no doubt but that that court is one competent to entertain jurisdiction of all the matters set up in the present suit. As to those matters, and to the parties, it is a court of concurrent jurisdiction with the Circuit Court of the United States, and as between those courts the rule is applicable that the one which has first obtained jurisdiction in a given case must retain it exclusively uutil it disposes of it by a final judgment or decree.
But when the pendency of such a suit is set up to defeat another, the case must be the same. There must be the same parties, or at least, such as represent the same interest, there must be the same rights asserted, and the same relief prayed for. This relief must be founded on the same facts, and the title or essential basis of the relief sought must be the same. The identity in these particulars should be such that if the pending case had-already been disposed of, it could be pleaded in bar as a former adjudication of the same matter between the same parties.
Iu the case of Barrows v. Kindred,* which ivas an action of ejectment, the plaintiff showed a good title to the land, and the defendant relied on a former judgment in his favor, between the same parties for the same land; the statute of Illinois making a judgment in such an action as conclusive as in other personal actions, except by way of new trial. But this court held that as in the second suit the plaintiff introduced and relied upon a new and different title, acquired since the first trial, that judgment could bo no bar, because that title had not been passed upon by the court iu the first suit.
But the principles which should govern in regard to the identity of the matters in issue in the two suits to make the pendency of the one defeat the other, are as fully discussed, in the case of Buck v. Colbath,† where that was the main question, as in any case we have been able to find. It was *716 an action of trespass, brought in a State court, against the marshal of the Circuit Court of the-United States for seizing property of the plaintiff, under a writ of attachment from the Circuit Court. And it was brought while the suit in the Federal court was still pending, and while the marshal held the property subject to its judgment. So far as the Us pendens and possession of the property in one court, and a suit brought for the taking by its officer in another, are concerned, the analogy to the present case is very strong. In that case the court said: “It is not true that a court, having obtained jurisdiction of a subject-matter of suit and of parties before it, thereby excludes all other courts from the right to adjudicate upon other matters having a very close connection with those before the first court, and in some instances requiring the decision of the same question exactly. In examining into the exclusive character of the jurisdiction in such cases, we must have regard to the nature of the remedies, the character of the relief sought, and the identity of the parties in the different suits.” And it might have been added, to the facts on which the claim for relief is founded. “A party,” says the court by way of example, “having notes secured by a mortgage on real estate, may, unless restrained by statute, sue in a court of chancery to foreclose his mortgage, and in a court of law to recover a judgment on his notes, and in another court of law in an action of ejectment for possession of the land. Here, in all the suits, the only question at issue may be the existence of the debt secured by the mortgage. But, as the relief sought is different, and the mode of proceeding different, the jurisdiction of neither court is affected by the proceedings in the other.” This opinion contains a critical review of the cases in this court of Hagan v. Lucas,* Peck v. Jenness,† Taylor v. Carryl,‡ and Freeman v. Howe,§ cited and relied on by counsel for the appellants; and we are satisfied that it states the doctrine correctly.
The limits which necessity assigns to this opinion forbid *717 our giving at length, the pleadings in the case in the Louisville Chancery Court. But we cannot better state what is, and what is not, the subject-matter of that suit or controversy, as thus presented and as shown throughout its course, than by adopting the language of the Court of Appeals of Kentucky, in its opinion delivered at the decision of that suit, in favor of the present appellants. “ As suggested in argument,” says the court, “ and apparently conceded ou both sides, this is not a case of division or schism in a church; nor is there any question as to which of two bodies should be recognized as the Third or Walnut Street Presbyterian Church. Neither is there any controversy as to the authority of Watson and Galt to actas ruling elders; but the sole inquiry to which we are restricted in our opinion is, whether Avery, McNaughtan, and Leach are also ruling elders, and therefore members of the session of the church.”
■ The pleadings in the present suit show conclusively a different state of facts, different issues, and a different relief sought. This is a case of a division or schism in the church. It is a question as to which of two bodies shall be recognized as the Third or Walnut Street Presbyterian Church. There is a controversy as to the authority of Watson and Gait to act as ruling elders, that authority being denied in the bill of the complainants; and, so far from the claim of Avery, McNaughtan, and Leach to be ruling elders being the sole inquiry in this case, it is a very subordinate matter, and it depends upon facts and circumstances altogether different from those set up and relied on in the other suit, and which did not exist when it was brought. The issue here is no longer a mere question of eldership, but it is a separation of the original church members and officers into two distinct bodies, with distinct members and officers, each claiming to be the true Walnut Street Presbyterian Church, and denying the 'right of the other to any such claim. This brief statement of the issues in the two suits leaves no room for argument to show that the pendency of the first cannot be pleaded either in bar or in abatement of the second.
The supplementary petition filed by the plaintiff's in that *718 case, after the decree of the Chancery Court had been reversed on appeal, and which did contain very much the same matter found in the present bill, was, on motion of the plaintiffs’ counsel, and by order of the court, dismissed, without prejudice, before this suit was brought, and of course was not a lis pendens at that time.
It is contended, however, that the delivery to the trustees and elders of the body of which the plaintiffs are members, of the possession of the church building cannot be granted in this suit, nor can the defendants be enjoined from taking possession as prayed in the bill, because the property is iu the actual possession of the marshal of the Louisville Chancery Court as its receiver, and because there is an unexecuted decree of that court ordering the marshal to deliver the possession to defendants.
In this the counsel for the appellants are, in our opinion, sustained, both by the law and by the state of the record of the suit in that court.
The court, in the progress of that suit, made several orders concerning the use of the church, and finally placed it in the possession of the marshal as a receiver, and there is no order discharging his receivership; nor does it seem to us that there is any valid order finally disposing of the case, so that it can be said to be no longer in that court. For, though the Chancery Court did, on the 20th March, 1868, after the reversal of the case in' the Court of Appeals, enter an order reversing its former decree and dismissing the bill, with costs, in favor of the defendants, the latter, on application to the appellate court, obtained another order dated June 26th. By this order, or mandate to the Chancery Court, it was directed to render a judgment in conformity to the opinion and mandate of the court, restoring possession, use, and control of the church property to the parties entitled thereto, according to said opinion, and so far as they were deprived thereof by the marshal of the Chancery Court under its order.
In obedience to this mandate the Chancery Court, on the 18th September, three months after the commencement of *719 this suit, made an order that the marshal restore the possession, use, and control of the church building to Henry Farley, George Fulton, B. F. Avery, or a majority of them, as trustees, and to John Watson, Joseph Galt, and T. J. Hackney, or a majority of them, as ruling elders, and to report how he had executed the order, and reserving the case for such further order as might be necessary to enforce full obedience.
It is argued here by counsel for the appellees that the case was, in effect, disposed of by the orders of the Chancery Court, and that nothing remained to be done which could have any practical operation on the rights of the parties.
But if the Court of Appeals, in reversing the decree of the chancellor in favor of the plaintiffs, was of opinion that ■the defendants should be restored to the position they occupied in regard to the possession and control of the property before that suit began, we have no doubt of their right to make such order as was necessary to effect that object; and as the proper mode of doing this was by directing the chancellor to make the necessary order, and have it enforced as chancery decrees are enforced in his court, we are of opinion that the order of the Court of Appeals, above recited, was in essence and effect, a decree in that cause for such restoration, and that the last order of the Chancery Court, made in accordance with.it, is a valid subsisting decree, which, though final, is unexecuted.
The decisions of this court in the cases of Taylor v. Carryl,* and Freeman v. Howe,† and Buck v. Colbath,‡ are conclusive that the marshal of the Chancery Court cannot be displaced as to the mere actual possession of the property, because that might lead to a personal conflict between the officers of the two courts for that possession. And the act of Congress of March 2d, 1798,§ as construed in the cases of Diggs v. Wolcott,ǁ and Peck v. Jenness,¶ are equally conclusive against any injunction from the Circuit Court, forbidding the defend *720 ants to take the possession which the unexecuted decree of the Chancery Court requires the marshal to deliver to them.
But, though the prayer of the bill in this suit does ask for an injunction to restrain Watson, Galt, Fulton, and Farley from taking possession, it also prays such other and further relief as the nature of the case requires, and especially that said defendants be restrained from interfering with Hays, as-pastor, and plaintiffs in worshipping in said church. Under-this prayer for general relief, if there was any decree which the Circuit Court could render for the protection of the right of the plaintiffs, and which did not enjoin the defendants from taking possession of the church property, and which did not disturb the possession of the marshal of the Louisville chancery, that court had a right to hear the case and grant that relief. This leads us to inquire what is the nature and character of the possession to which those parties are to be restored.
One or two propositions which seem to admit of no controversy are proper to be noticed in this connection. 1. Both by the act of the Kentucky legislature creating the trustees of the church a body corporate, and by the acknowledged rules of the Presbyterian Church, the trustees were the mere nominal title-holders and custodians of the church property, and other trustees were, or could be elected by the congregation, to supply their places once in every two years. 2. That in the use of the property for all religious services or ecclesiastical purposes, the trustees were under the control of the church session. 3. That by the constitution of all Presbyterian churches, the session, which is the governing body in each, is composed of the ruling elders and pastor, and in all business of the session the majority of its members govern, the number of elders for each congregation being variable.
The trustees obviously-hold possession for the use of the persons who by the constitution, usages, and laws of the Presbyterian body, are entitled to that use. They are liable to removal by the congregation for whom they hold this trust, and others may be substituted in their places. They *721 have no personal ownership or right beyond this, and are subject in their official relations to the property, to the control of the session of the church.
The possession of the elders, though accompanied with larger and more efficient powers of control, is still a fiduciary possession. It is as a session of the church alone that, they could exercise power. Except by an order of the session in regular meeting they have no right to make any order concerning the use of the building; and any action of the session is necessarily in the character of representatives of the church body by whose members it was elected.
If then, this true body of the church, the members of that congregation, having rights of user in the building, have in a mode which is authorized by the canons of the general church in this country elected and installed other elders, it does not seem to us inconsistent or at variance with the nature of the possession which we have described, and which the Chancery Court orders to be restored to the defendants, that they should be compelled to recognize these rights, and permit those who are the real beneficiaries of the trust held by them, to enjoy the uses, to protect which that trust was created. Undoubtedly if the order of the Chancery Court had been executed, and the marshal had delivered the key of the church to the defendants, and placed them in the same position they were in before that suit was commenced, they could in any court having jurisdiction and in a case properly made out, be compelled to respect the rights we have stated, and be controlled in their use of the possession by the court, so far as to secure those rights.
All that we have said in regard to the possession which the marshal is directed to deliver to the defendants, is equal Inapplicable to the possession held by him pending the execution of that order. His possession is a substitute for theirs, and the order under which he received that possession, which we have recited, shows this very clearly.
The decree which we are now reviewing seems to us to be carefully framed on this view of the matter. While the rights of the plaintiffs and those whom they sue for, are ad *722 mitted and established, the defendants are still recognized as entitled to the possession which we. have described; and while the} are not enjoined from receiving that possession from the marshal, and he is not restrained from obeying the Chancery Court by delivering it, and while there is no order made on the marshal at all to interfere with his possession, the defendants are required by the decree to respect the. rights of the plaintiffs, and to so use the possession and control to which they may be restored as not to hinder or obstruct the true uses of the trust, which that possession is intended to protect.
We are next to inquire whether the decree thus rendered is based upon an equally just view of the law as applied to. the facts of this controversy.
The questions which have come before the civil courts concerning the rights to property held by ecclesiastical bodies, may, so far as we have been able to examine them, be profitably classified under three general heads, which of course do not include cases governed by considerations applicable to a church established and supported by law as the religion of the state.
1. The first of these is when the property which is the subject of controversy has been, by the deed or will of the donor, or other instrument by which the property is held, by the express terms of the instrument devoted to the teaching, support, or spread of some specific form of religious doctrine or belief.
2. The second is when the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority.
3. The third is where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general aud ultimate power of control more or less complete,-in some su *723 preme judicatory over the whole membership of that general organization.
In regard to the first of these classes it seems hardly to admit of a rational doubt that an individual or an association of individuals may dedicate property by way of trust to the purpose of sustaining, supporting, and propagating definite religious doctrines or principles, provided that in doing so they violate no law of morality, and give to the instrument by which their purpose is evidenced, the formalities which the laws require. And it would seem also to be the obvious duty of the court, in a case properly made, to see that the property so dedicated is not diverted from the trust which is thus attached to its use. So long as there are persons qualified within the meaning of the original dedication, and ■who are also willing to teach the doctrines or principles prescribed in the act of dedication, and so long as there is any one so interested in the execution of the trust as to have a standing in court, it must be that they can prevent the diversion of the property or fund to other and different uses. This is the general doctrine of courts of equity as to charities, and it seems equally applicable to ecclesiastical matters.
In such case, if the trust is confided to a religious congregation of the independent or congregational form of church government, it is not in the power of the majority of that congregation, however preponderant, by reason of a change of views on religious subjects, to carry the property so confided to them to the support of new and conflicting doctrine. A pious man building and dedicating a house of worship to the sole and exclusive use of those who believe in the doctrine of the Holy Trinity, and placing it under the control of a congregation which at the time holds the same belief, has a right to expect that the law will prevent that property from being used as a means of support and dissemination of the Unitarian doctrine, and as a place of Unitarian worship. Nor is the principle varied when the organization to which the trust is confided is of the second or associated form of church government. The protection which the law *724 throws around the trust is the same. And though the task may be a delicate one and a difficult one, it will be the duty of the court in such cases, when the doctrine to be taught or the form of worship to be used is definitely and clearly laid down, to inquire whether the party accused of violating the trust is holding or teaching a different doctrine, or using a form of worship which is so far variant as to defeat the declared objects of the trust. In the leading case on this subject, in the English courts, of the Attorney-General v. Pearson,* Lord Eldon said, “Í agree with the defendants that the religions belief of the parties is irrelevant to the matters iu dispute, except so far as the King’s Court is called upon to execute the trust.” That was a case in which the trust-deed declared the house which was erected under it was for the worship and service of God. And though we may not be satisfied with the very artificial and elaborate argument by which the chancellor arrives at the conclusion, that because any other view of the nature of the Godhead than the Trini-» tarian view was heresy by the laws of England, and anyone giving expression to the Unitarian view was liable to be severely punished for heresy by the secular courts, at the time the deed was made, that the trust was, therefore, for Trinitarian worship, we may still accept the statement that the court has the right'to enforce a trust clearly defined on such a subject.
The case of Miller v. Gable† appears to have been decided in the Court of Errors of New York on this principle, so far as any ground of decision can be gathered from the opinions of the majority of the court as reported.
The second class of cases which we have described has reference to the case of a church of a strictly congregational or independent organization, governed solely within itself, either by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government; and to property held by such a church, either by way of purchase or donation, with no other specific *725 trust attached to it in the hands of the church than that it is for the use of that congregation as a religious society.
In such cases where there is a schism which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations. If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property. If there be within the congregation officers in whom are vested the powers of such control, then those who adhere to the acknowledged organism by which the body is governed are entitled to the use of the property. The minority in choosing to separate themselves into a distinct body, and refusing to recognize the authority of the governing body, can claim no rights in the property from the fact that they had once been members of the church or congregation. This ruling 'admits of no inquiry into the existing i’eligions opinions of those who comprise the legal or regular organization; for, if such was permitted, a very small minority, without any officers of the church among them, might be found to be the only faithful supporters of the religious dogmas of the founders of the church. There being no such trust imposed upon the property when purchased or given, the court will not imply one for the purpose of expelling from its use those who by regular succession and order constitute the church, because they may have changed iu some respect their views of religious truth.
Of the cases in lvhich this doctrine is applied no better representative can be found tliau that of Shannon v. Frost,* where the principle is ably supported by the learned Chief Justice of the Court of Appeals of Kentucky.
The case of Smith v. Nelson,† asserts this doctrine in a case where a legacy was left to the Associate Congregation of Ryegate, the interest whereof was to be anuually paid to their minister forever. In that case, though the Ryegate *726 congregation was one of a number of Presbyterian churches connected with the general Presbyterian body at large, the court held that the only inquiry was whether the society still exists, and whether they have a minister chosen and appointed by the majority and regularly ordained over the society, agreeably to the usage of that denomination. And though we may be of opinion that the doctrine of that case needs modification, so far as it discusses the relation of the Ryegate congregation to the other judicatories of the body to which it belongs, it certainly lays down the principle correctly if that congregation was to be treated as an independent one.
But the third of these classes of cases is the one which is oftenest found in the courts, and which, with reference to the number and difficulty of the questions involved, and to other considerations, is every way the most important.
It is the case of property acquired in any of the usual modes for the general use of a religious congregation which is itself part of a large and general organization of some religious denomination, with which it is more or less intimately connected by religious views and ecclesiastical government.
The case before us is one of this class, growing out of a schism which has divided the congregation and its officers, and the presbytery and synod, and which appeals to the courts to determine the right to the use of the property so acquired. Here is no case of property devoted forever by the instrument which conveyed it, or by any specific declaration of its owner, to the support of any special religious dogmas, or any peculiar form of worship, but of property purchased for the use of a religious congregation, and so long as any existing religious congregation can be ascertained to be that congregation, or its regular and legitimate successor, it is entitled to the use of the property. In the case of an independent congregation we have pointed out how this identity, or succession, is to be ascertained, but in cases of this character we are bound to look at the fact that the local congregation is itself but a member of a much *727 larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments. There are in the Presbyterian system of ecclesiastical government, in regular succession, the presbytery over the session or local church, the synod over the presbytery, and the General Assembly over all. These are called, in the language of the church organs, “judicatories,” and they entertain appeals from the decisions of those below, and prescribe corrective measures in other cases.
In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the ease before them.
We concede at the outset that the doctrine of the English courts is otherwise. In the case of the Attorney-General v. Pearson, cited before, the proposition is laid down by Lord Eldon, and sustained by the peers, that it is the duty of the court iu such cases to inquire and decide for itself, not only what was the nature and power of these church judicatories, but what is the true standard of faith in the church organization, and which of the contending parties before the court holds to this standard. And in the subsequent case of Craigdallie v. Aikman,* the same learned judge expresses in strong terms his chagrin that the Court of Sessions of Scotland, from which the case had been appealed, had failed to find on this latter subject, so that he could rest the case on religious belief, but had declared that in this matter there ivas no difference between the parties. And we can very well understand how the Lord Chancellor of England, who is, in his office, in a large sense, the head and representative of *728 the Established Church, who controls very largely the church patronage, and whose judicial decision may be, and not unfrequently is, invoked in cases of heresy and ecclesiastical contumacy, should feel, even in dealing with a dissenting church, but little delicacy in grappling with the most abstruse problems of theological controversy, or in construing the instruments which those churches have adopted as their rules of government, or inquiring into their customs and. usages. The dissenting church in England is not a free church in the sense in which we apply the term in this country, and it was much less free in Lord Eldon’s time than now. Laws then existed upon the statute-book ham'pering the free exercise of religious belief and worship in many most oppressive forms, and though Protestant dissenters were less burdened than Catholics and Jews, there did not exist that full, entire, and practical freedom for all forms of religious belief and practice which lies at the foundation of our political principles. And it is quite obvious, from an examination of the series of cases growing out of the organization of the Free Church of Scotland, found in Shaw’s Reports of Cases in the Court of Sessions, that it was only-under the pressure of Lord Eldon’s ruling, established in the House of Lords, to which final appeal lay in such eases, that the doctrine was established in the Court of Sessions after no little struggle and resistance. The full history of the case of Craigdallie v. Aikman, in the Scottish court, which we cannot further pursue, and the able opinion of Lord Meadowbank in Galbraith v. Smith,* show this conclusively.
In this country the full and free right to entertain any religious belief, to practice any religious principle, and to' teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of *729 any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound"to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of ques. tions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.
Nor do we see that justice would be likely to be promoted by submitting those decisions to review in the ordinary judicial tribunals. Each of these large aud influential bodies (to mention no others, let reference be had to the Protestant Episcopal, the Methodist Episcopal, and the Presbyterian churches), has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usage and customs, which as to each constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposédthat the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so.
We have said that these views are supported by the preponderant weight of authority in this country, and for the reasons which we have given, we do not think the doctrines of the English Chancery Court on this subject should have with us the influence which we would cheerfully accord to it on others.
*730 We have already cited* the case of Shannon v. Front, in which the appellate court of the State where this controversy originated, sustains the proposition clearly and fully. “This court,” says the Chief Justice, “having no ecclesiastical jurisdiction, cannot revise or question ordinary acts of church discipline. Our only judicial power in the ease arises from the conflicting claims of the parties to the church property and the use of it. We cannot decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or irregularly cut off from the body of the church.”
In the subsequent case of Gibson v. Armstrong,† which arose out of the general division of the Methodist Episcopal Church, we understand the same principles to be laid down as governing that case, and in the case of Watson v. Avery,‡ the case relied on by the appellants as a bar, and considered in the former part of this opinion, the doctrine of Shannon v. Frost is in general terms conceded, while a distinction is attempted which we shall consider hereafter.
One of the most careful and well-considered judgments on the subject is that of the Court of Appeals of South Carolina, delivered by Chancellor Johnson in the case of Harmon v. Dreher.§ The case turned upon certain rights in the use of the church property claimed by the minister notwithstanding his expulsion from the synod as one of its members. “He stands,” says the chancellor, “convicted of the offences alleged against him, by the sentence of the spiritual body of which he was a voluntary member, and whose proceedings he had bound himself to abide. It belongs not to the civil power to enter into or review the proceedings of a spiritual court. The structure of our government has, for the preservation of civil liberty, rescued the temporal institutions from religious interference.. On the other hand, it has secured religious liberty from the invasion of the civil authority. The judgments, therefore, of *731 religious associations, bearing on their own members, are uot examinable here, and I am not to inquire whether the doctrines attributed to Mr. Dreher were held by him, or whether if held were anti-Lutheran; or whether his conduct was or was not in accordance with the duty he owed to the synod or to his denomination. . . . When a civil right depends upon an ecclesiastical matter, it is the civil court and not the ecclesiastical which is to decide. But the civil tribunal tries the civil right, and no more, taking the ecclesiastical decisions out of which the civil right arises as it finds them.” The principle is reaffirmed by the same court in the John’s Island Church Case*
In Den v. Bolton,† the Supreme Court of New Jersey asserts the same principles, and though founding its decision mainly on a statute, it is said to be true on general principles.
The Supreme Court of Illinois, in the case of Ferraria v. Vasconcelles,‡ refers to the case of Shannon v. Frost with approval, and adopts the language of the court that “the judicial eye cannot penetrate the veil of the church for the forbidden purpose of vindicating the alleged wrongs of excised members; when they became members they did so upon the condition of continuing or not as they and their churches might determine, and they thereby submit to the ecclesiastical power and cannot now invoke the supervisory power of the civil tribunals.”
In the very important case of Chase v. Cheny, recently decided in the same court, Judge Lawrence, who dissented, says, “We understand the opinion as implying that in the administration of ecclesiastical discipline, and where no other right of property is involved than loss of the clerical office or salary incident to such discipline, a spiritual court is the exclusive judge of its own jurisdiction, and that its decision of that question is binding on the secular courts.” And he dissents with Judge Sheldon from the opinion because it so holds.
*732 Iii the case of Watson v. Farris* which was a case growing out of the schism in the Presbyterian Church in Missouri in regard to this same Declaration and Testimony and the action of the General Assembly, that court held that whether a case was regularly or irregularly before the Assembly was a question which the Assembly had the right to determine for itself, and no civil court could reverse, modify, or impair its action in a matter of merely ecclesiastical concern.
We cannot better close this review of the authorities than in the language of the Supreme Court of Pennsylvania, in the case of the German Reformed Church v. Seibert:† “ The decisions of ecclesiastical courts, like every other judicial tribunal, are final, as they are the best judges of what constitutes an offence against the word of God and the discipline of the church. Any other than those courts must be incompetent judges of matters of faith, discipline, and doctrine; and civil courts, if they should be so unwise as to attempt to supervise their judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt which would do anything but improve either religion or good morals.”
In the subsequent case of McGinnis v. Watson,‡ this principle is again applied and supported by a more elaborate argument.
The Court of Appeals of Kentucky, in the case of Watson v. Avery, before referred to, while admitting the general principle here laid down, maintains that when a decision of an ecclesiastical tribunal is set up in the civil courts, it is always open to inquiry whether the tribunal acted within its jurisdiction, and if it did not, its decision could not be conclusive.
There is, perhaps, uo word in legal terminology so frequently used as the word jurisdiction, so capable of use in a general and vague sense, and which is used so often by men learned in the law without a due regard to precision in its application. As regards its use in the matters we have *733 been discussing it may very well be conceded that if the General Assembly of the Presbyterian Church should undertake to try one of its members for murder, and punish him with death or imprisonment, its sentence would bo of no validity in a civil court or anywhere else. Or if it should at the instance of one of its members entertain jurisdiction as between him and another member as to their individual right to property, real or personal, the right in no sense depending on ecclesiastical questions, its decision would be utterly disregarded by any civil court where it might be set up. And it might be said in a certain general sense very justly, thatitwas because the General Assembly had no jurisdiction of the case. Illustrations of this character could be multiplied in which the proposition of the Kentucky court would be strictly applicable.
But it is a very different thing where a subject-matter of dispute, strictly and purely ecclesiastical in its character,—a matter over which the civil courts exercise no jurisdiction,—a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them,—becomes the subject of its action. It may be said here, also, that no jurisdiction has been conferred on the tribunal to try the particular case before it, or that, in its judgment, it exceeds the powers conferred upon it, or that the laws of the church do not authorize the particular form of proceeding adopted; and, in a sense often used in the courts, all of those may be said to be questions of jurisdiction. But it is easy to see that if the civil courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may, and must, be examined into with minuteness and care, for they would become, in almost every case, the criteria by which the validity of the ecclesiastical decree would be determined in the civil court. This principle would deprive these bodies of the right of construing their own church laws, would open the way to all the evils which we *734 have depicted as attendant upon the doctrine of Lord Eldon, and would, in effect, transfer to the civil courts where property rights were concerned the decision of all ecclesiastical questions.
And this is precisely what the Court of Appeals of Kentucky did in the case of Watson v. Avery. Under cover of inquiries into the jurisdiction of the synod and presbytery over the congregation, and of the General Assembly over all, it went into au elaborate examination of the principles of Presbyterian church government, and ended by overruling the decision of the highest judicatory of that church in the United States, both on the jurisdiction and the merits; and, substituting its own judgment for that of the ecclesiastical court, decides that ruling elders, declared to be such by that tribunal, are not such, and must not be recognized by the congregation, though four-fifths of its members believe in the judgment of the Assembly and desired to conform to its, decree.
But we need pursue this subject no further. Whatever may have been the case before the Kentucky court, the appellants in the case presented to us have separated themselves wholly from the church organization to which they belonged when this controversy commenced. They now deny its authority, denounce its action, and refuse to abide by its judgments. They have first erected themselves into a new organization, and have since joined themselves to another totally different, if not hostile, to the one to which they belonged when the difficulty first began. Under any of the decisions which we have examined, the appellants, in their present position, have no right to the property, or to the use of it, which is the subject of this suit.
The novelty of the questions presented to this court for the first time, their intrinsic importance and far-reaching influence, and the knowledge that the schism in which the case originated has divided the Presbyterian churches throughout Kentucky and Missouri, have seemed to us to justify the careful and laborious examination and discussion which we *735 have made of the principles which should govern the case. For the same reasons we have held it under advisement for a year; not uninfluenced by the hope, that since the civil commotion, which evidently lay at the foundation of the trouble, has passed away, that charity, which is so large an element in the faith of both parties, and which, by one of the apostles of that religion, is said to be the greatest of all the Christian virtues, would have brought about a reconciliation. But we have been disappointed. It is not for us to determine or apportion the moral responsibility which attaches to the parties for this result. We can only pronounce the judgment of the law as applicable to the case presented to us, aud that requires us to affirm the decree of the Circuit Court as it stands.
Decree affirmed.
The CHIEF JUSTICE did not sit on the argument of this case, and took no part in its decision.

 4 Wallace, 399.

 3 Id. 334.

 10 Peters, 402.

 7 Howard, 624.

 20 Id. 594.

 24 Id. 450.

 20 Howard, 594.

 24 Id. 450.

 3 Wallace, 334.

 Stut. at Large, 334, g 5.

 4 Craneh, 179.

 7 Howard, 625.

 3 Merivale, 853.

 2 Denio, 492.

 3 B. Monro, 253.

 18 Vermont, 511.

 2 Bligh, 629.

 15 Shaw, 808.

 Supra, p. 725.

 7 B. Monro, 481.

 2 Bush, 332.

 Speer’s Equity, 87.

 2 Biehardson’s Equity, 215.

 7 Halstead, 206.

 23 Illinois, 456.

 45 Missouri, 188.

 3 Barr, 291.

 41 Pennsylvania State, 21.

Confession of Faith, chapter 25.