153 So.2d 337 (1963)
The FIRST INDEPENDENT MISSIONARY BAPTIST CHURCH OF CHOSEN, a non-profit corporation organized under the laws of Florida, Appellant,
v.
Lester McMILLAN et al., Appellees.
No. 3444.
District Court of Appeal of Florida. Second District.
May 15, 1963.
*338 Hal S. Ives, of Ives & Davis, West Palm Beach, for appellant.
John R. Williams, West Palm Beach, for appellees.
ALLEN, Judge.
Appellant, defendant and counterclaimant below, appeals a final decree for appellees, plaintiffs below.
Plaintiff-appellees instituted an action, alleging that they were trustees and charter members of the First Independent Missionary Baptist Church of Chosen, that said church was an unincorporated religious association established in 1950, that said church, in 1950 and 1951, acquired title to certain real property and had executed mortgages on the property, and that said church owned certain personal property and maintained a bank account. Plaintiff-appellees further alleged that in 1958 a dispute arose concerning one of the mortgages and in consequence of this dispute certain members, *339 a majority of the membership, voted to vacate the church building and convey it to the mortgagee and to build a new church elsewhere, but a minority of the membership, the plaintiff-appellees' chose to remain in the original building and continue payment of the mortgage. Plaintiff-appellees then alleged that the majority took possession of the other real property and the personal property and made payments on the mortgage on the other property, that the majority caused themselves to be incorporated and seated as members of a state Baptist association, all of which conduct was in derogation of plaintiff-appellees' rights in the property and name of the church.
Offering to do equity, appellees sought relief in the form of a declaration that they, the minority were the representatives of the church organized in 1950, that the real and personal property of that church be held to be theirs and that all actions and representations by the majority to the contrary be declared void and all such future activities enjoined.
Defendant-appellant's answer admitted most of the factual allegations but insisted that they were the representatives of the church established in 1950 and prayed relief according to this latter allegation.
In summary, appellees alleged and argued that the appellant majority had left and abandoned the church and thereby relinquished all rights in the church property, while appellant alleged and argued that they, a majority of the membership, were, in fact, the church and had and could hold and dispose of the church property.
Upon hearing, the lower court found for the plaintiff-appellees minority and decreed that the property or value thereof of the church be placed in the hands of the minority, that the bank account be divided pro-rata, that the minority reimburse the majority for maintenance and improvement on the property and, upon geographic considerations, that the majority be allowed the use of the church name. This appeal ensued.
Appellant argues that the 1958 transaction whereby the majority group voted to abandon the church building was a transaction wherein the church, an association admittedly governed by majority rule, validly determined to dispose of a particular asset, a piece of real property.
Appellee, on the other hand, argues that the church property was dedicated in trust to religious purposes as a church and parsonage and that the lower court properly determined to enforce the trust on behalf of the minority willing to continue use of the property for the trust purposes.
Upon examination of the authority relied upon by appellee, E.g. First Born Church, etc. v. The First Born Church, etc., 1945, 156 Fla. 78, 22 So.2d 452; St. John's Presbytery v. Central Presbyterian Church, Fla. 1958, 102 So.2d 714, 715, it is found, as appellees concede, that these cases concern churches with an organization different from the congregational organization with which we are here concerned, and it is further found that the principle enunciated in those cases has no application in the instant case. Indeed, in the latter case cited, the Supreme Court recognized the inapplicability of the principle in a case like that of instant concern:
"* * * When the church is representative, republican or episcopal in government, the authorities uniformly hold that the church property whether held by an express or an implied trust cannot be diverted from the parent church by those who withdraw from it and form a separate denomination. It matters not whether those who withdraw from the mother church constitute a majority or a minority faction, the church property remains with the mother church. There are exceptions to this rule when the schism occurs in a church whose government is congregational in form like the Baptist or Congregational denominations * * *." (Emphasis added.)
*340 The controlling legal principle in the instant case was enunciated in Partin v. Tucker, 1937, 126 Fla. 817, 172 So. 89. In that case a schism, having its origin in matters different from those of instant concern, resulted in litigation to determine ownership of the church property. Quoting with approval the case of Watson v. Jones, U.S. 1872, 13 Wall. 679, 20 L.Ed. 666, the Court wrote:
"* * * `Where a church is of a strictly congregational or independent organization, and the property held by it has no trust attached to it, its rights to the use of the property must be determined by the ordinary principles which govern voluntary associations.'"
The content given this general principle in the Partin case is in accord with the more specific statement found in 45 Am. Jur., Religious Societies § 54:
"* * * Thus, when a church, strictly congregational or independent in its organization, is governed solely within itself, either by a majority of its membership or by such other local organism as it may have instituted for the purpose of ecclesiastical government, and holds property either by way of purchase or donation, with no other specific trust attached to it than that it is for the use of the church, the numerical majority of the membership of the church may ordinarily control the right to the use and title of such property."
Turning from an abstract discussion of principles of law to the specific issues here involved, it becomes apparent that the factual rock upon which the lower court built its eventual disposition of the cause is embodied in the findings:
"* * * [T]hat the majority group voted to leave the Church and the Church building * * * further * * * that when the majority group voted to leave the original Church * * * they also voted to leave the parsonage property * * *"
These findings are reiterated and explained in the order denying the petition for rehearing.
"The evidence shows and the final decree recites that the majority group voted to leave the church and the church building. Had they voted to remain rather than leave and abandon the church property, they would have been entitled to the church property. * * *
"When church property is abandoned, equity will not permit the group leaving the church to select a few items of personal property and take with them; nor will equity permit them to retain a portion of the church property known as the parsonage. * * *"
Accordingly, it is apparent that in the able trial judge's view this was not a case involving conflicting factions of the church, but one involving the church and a dissident group composed of former members of the church. Appellant, recognizing this, argues that the majority could not withdraw from the church because, in an organization of the congregational type, the majority is the church.
Upon consideration it would appear that the two views are not irreconcilable and that even if the general principle that "a majority is the church" is recognized, particular factual circumstances can give the actions of the majority a character incompatible with the view that they continue to constitute "the church." The latter possibility was recognized in the Partin case cited earlier, when the claim of a minority based on a majority's alleged deviation from the church was rejected because,
"* * * the record does not affirmatively show that the fundamental principles of the Christian religion adhered to by the congregation of Pine Grove Baptist Church at the time the deed was made to the trustees of such church have been abandoned by the successor trustees and those associated *341 with and worshiping with them in this organization * * *."
In the instant case the acts found to constitute abandonment of the church were not alleged heresies. The abandonment charged was that of the church building. The majority group did not abandon the church but only the building in which they worshiped.
It is interesting to note that the appellees, plaintiffs below, in their complaint, paragraph 10, states:
"10. That on October 12, 1958, a Conference was held whereby it was purportedly moved and voted upon to abandon said church property; that as a result of said purported Conference action, approximately 50 members comprising the newer faction removed themselves from the church, with the announced intention of conducting services elsewhere, and of building a new church building; that the original group of approximately 40 members remained in the original church building with the announced intention of continuing services there; that since said time, each faction or group has continuously conducted its own services in its respective locations, each faction has continued to claim and to use the name of First Independent Missionary Baptist Church of Chosen, and each faction has continued to claim the ownership and control of the original church building and the parsonage hereinbefore described."
Since the principle that a majority rules is uncontradicted in the record, it follows that a majority of the membership in meeting could exercise control over the church building, parsonage and personalty. Such a majority could vote to sell the building and real property, to build an addition to the church building, or to raze the building. Similarly, the majority could vote to negotiate financing of the building and, if the former was successful, could vote and approve a new financing scheme.
The majority faction in this case abandoned the church building, but retained the parsonage. The pastor then serving the church was living in the parsonage and continued to live therein after the majority faction had discontinued using the original church building. When they selected a new place of worship, the pastor continued to live in the parsonage while acting as the pastor for the majority membership in a new church meeting place.
We note, incidentally, that the new church that was subsequently built, is located approximately about a block and a half from where the parsonage is located.
The church was and is an association adhering to certain fundamental doctrines and is, through trustees, possessed of certain authority over property and impressed with certain responsibilities. If a doctrinal schism had occurred among the church members and the majority of the members had left the church congregation and abandoned it, a question might arise which does not, however, arise in the instant case.
In 45 Am.Jur., Religious Societies, § 22, the following appears:
"§ 22. Majority Vote; Control of Church Affairs.  Consistently with the particular and general laws of the organization or denomination to which it belongs, a majority of a church organization may control church affairs. Hence, it is generally held that a majority of those present and voting at a regular meeting of a church or religious society governs, and its action is binding on the whole body. Thus, a constitutional provision that the affairs of a religious society shall be managed by the whole congregation does not require the assent of each member to render any particular act valid, since such phrase merely refers to action taken at a meeting which the members are entitled and have the opportunity to attend. In all such elections the nonvoters must be counted as willing to be bound by the *342 action of the majority of those who vote, for any other rule would lead to interminable trouble and uncertainty."
A footnote to this section includes inter alia:
"The majority rule prevails in independent or congregational societies in the absence of a breach of trust, express or implied, so that in societies like those of the Congregational or Baptist denominations, which have no organic connection with any external ecclesiastical body, the will of the majority, when duly and regularly expressed through the channels of the society, ordinarily prevails. Anno: 8 ALR 108, s. 70 ALR 78.
"Each Baptist Church is within itself a pure democracy, to the expressed will of the majority of which it is, as a rule, the duty of the minority to submit. * * * Anno: 70 ALR 78."
Various courts have defined the word "church" in many ways. See Black, Law Dictionary (3rd ed. 1933) at p. 325.
"A body or community of Christians, united under one form of government by the profession of the same faith, and the observance of the same ritual and ceremonies." (See McNeilly v. First Presbyterian Church in Brookline, 243 Mass. 331, 137 N.E. 691, 694.)
"[A]n organization for religious purposes, for the public worship of God." (Bennett v. City of LaGrange, 153 Ga. 428, 112 S.E. 482, 485, 22 A.L.R. 1312.)
"The term may denote either a society of persons who, professing Christianity, hold certain doctrines or observances which differentiate them from other like groups, and who use a common discipline, or the building in which such persons habitually assemble for public worship." (Baker v. Fales, 16 Mass. 488, 498; Tate v. Lawrence, 11 Heisk. (Tenn.) 503.)
We are of the view that the abandonment of a church building did not constitute abandonment of "The First Independent Missionary Baptist Church of Chosen" and, therefore, we conclude that the property owned by The First Independent Missionary Baptist Church of Chosen, at the time of the abandonment by the majority of the church building, belongs to the majority group.
The minority group has continued to meet in the abandoned church building and it is not involved in this suit. The lower court determined that the majority group should have the right to continue the use of its name of "The First Independent Missionary Baptist Church of Chosen" and that the minority group should choose some other name, which the judge suggested to be "The First Independent Missionary Baptist Church of Belle Glade." We see no need of disturbing this part of the decree.
The lower court held that the majority group should reimburse the minority group for the value of the rug, song books, communion set, and collection plates as were taken from the original church. In our view, the majority group has the same right to these articles as they do to the parsonage.
The lower court also required the majority group to reimburse the minority group in the sum of $135.00 for the amount which was paid by certain of the members of the minority group on new pews to be purchased. The evidence indicates that about $800.00 was collected from both groups for this purpose prior to the abandonment of the building but that this sum of money had not been used and was on deposit in one of the local banks awaiting the outcome of this suit.
We shall not disturb this part of the decree. This money had never been used for the particular purpose for which it was collected and it is equitable for the majority group to return the amount paid in by the group, to-wit: $135.00.
Accordingly, the decree is reversed insofar as it purports to vest title or right to *343 the parsonage or specific personalty in the minority and insofar as it decrees reimbursements concerning that property. In all other respects the decree is affirmed.
SHANNON, C.J., and SMITH, J., concur.