DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**EGLISE BAPTISTE BETHANIE DE FT. LAUDERDALE, INC.,**
Appellant,

v.

**BANK OF AMERICA, N.A.,** and **SUNTRUST BANK,**
Appellees.

No. 4D20-1703

[May 26, 2021]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Nicholas Richard Lopane, Judge; L.T. Case No. CACE-19-021587(03).

Lawrence R. Metsch of MetschLaw, P.A., Aventura, for appellant.

Tricia J. Duthiers and Elizabeth A. Henriques of Liebler Gonzalez & Portuondo, Miami, for appellees.

DAMOORGIAN, J.

Appellant, Eglise Baptiste Bethanie De Ft. Lauderdale, Inc., ("the Church") appeals the final order granting Appellees', Bank of America, N.A. and Truist Bank, successor-by-merger to SunTrust Bank ("the Banks"), motion to dismiss the Church's complaint. The trial court granted the motion to dismiss the complaint with prejudice on the basis that "it lack[ed] subject matter jurisdiction based upon the doctrine of ecclesiastical abstention." We affirm the dismissal and, in so doing, rely upon the Eleventh Circuit's recent decision in *Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Seminole Tribe of Florida* (*Eglise II*), 824 F. App'x 680 (11th Cir. 2020).

In the underlying action, the Church, a Florida non-profit corporation conducting business as a Baptist church, filed a complaint alleging that the Banks negligently transferred control of the Church's bank accounts to Aida Auguste, the Church's deceased pastor's widow. Part and parcel of the complaint were numerous allegations that Auguste and her supporters were engaged in an illicit campaign to usurp the powers of the elected Board of Directors of the Church and to gain control of its assets.

The Banks responded to the complaint with a motion to dismiss, making several arguments, including that the action was barred pursuant to the ecclesiastical abstention doctrine.  The trial court held a hearing on the Banks' motion to dismiss and thereafter entered the final order dismissing the complaint with prejudice based upon the ecclesiastical abstention doctrine.

On appeal, the Church argues that the trial court erred in applying the ecclesiastical abstention doctrine because its claim for negligence against the Banks did not ask the trial court to adjudicate an ecclesiastical rule, custom, or law.  In response, the Banks argue that the trial court properly dismissed the case for lack of subject matter jurisdiction because the Church's negligence claims necessarily required the trier of fact to resolve the question of which church faction controlled the Church and its bank accounts.  Therefore, the Banks reason that the issue of control implicates the ecclesiastical abstention doctrine.

We agree with the Banks.  The Eleventh Circuit case, *Eglise II*, was spawned out of the same set of events which produced the instant case. In that case, the Church and Andy Saint-Remy[1] initially brought suit against Auguste in federal district court.  *Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Seminole Tribe of Fla.* (*Eglise I*), No. 19-cv-62591, 2020 WL 43221, at *1 (S.D. Fla. Jan. 3, 2020).  The plaintiffs brought claims against Auguste for violation of 18 U.S.C. § 248(a)(2), alleging that Auguste's claim of leadership and exclusion of plaintiffs from the property interfered with plaintiffs' exercise of the First Amendment right of religious freedom at a place of religious worship.  *Eglise I*, 2020 WL 43221 at *1. The district court dismissed the action, finding that plaintiffs' allegations against Auguste involved non-justiciable questions of internal church governance.  *Id.* at *12.

The Eleventh Circuit agreed with the district court, acknowledging that religious controversies are not subject to civil court inquiry.  *Eglise II*, 824 F. App'x at 682–83 ("We have long recognized that both the Establishment and Free Exercise Clauses require a prohibition on judicial cognizance of ecclesiastical disputes. . . .  [B]y entering into a religious controversy and putting the enforcement power of the state behind a particular religious faction, a civil court risks establishing a religion." (internal citations and quotation marks omitted)).

---

[1]  Saint-Remy is alleged in the complaint in this case to be the President of the Church and the individual that "warned" the Banks that Auguste and her supporters were engaged "in an illicit campaign . . . to gain control of the assets of [the Church]."

2

The court observed that plaintiffs framed their claims against Auguste as involving "merely a property dispute" rather than an ecclesiastical dispute. *Id.* at 683. However, the court found that this framing ignored two threshold issues:

> Before reaching the plaintiffs' § 248 claim, a court would need to determine whether Auguste was the rightful successor to the church's leadership and, if she was, whether Auguste had the authority to exclude the plaintiffs from the church's property. Answering these questions would require us to inquire into church rules, policies, and decision-making and *questions of church governance are manifestly ecclesiastical.*

*Id.* (emphasis added); *see also Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 717 (1976) ("[Q]uestions of church discipline and the composition of the church hierarchy are at the core of ecclesiastical concern . . . ."). The court concluded that "Auguste's decision to exclude the plaintiffs from church property and the related events are part and parcel of ecclesiastical concerns (e.g., matters of church governance, administration, and membership)." *Eglise II*, 824 F. App'x. at 683. It further held that "[t]he adjudication of these issues would 'excessively entangl[e] [us] in questions of ecclesiastical doctrine or belief'—the very types of questions we are commanded to avoid." *Id.* (alterations in original) (quoting *Crowder v. S. Baptist Convention*, 828 F.2d 718, 722 (11th Cir. 1987)). Thus, the Eleventh Circuit determined that the district court correctly dismissed the plaintiffs' case because the dispute was ecclesiastical in its character. *Id.*

Here, although the Church's negligence claims against the Banks involve a question of control over bank accounts, in order to resolve those claims the court would necessarily have to decide which faction within the Church controls the bank accounts. The only way for the court to make this determination is for it to consider the Church's internal governance structure. "[Q]uestions of church governance are manifestly ecclesiastical." *Id.* Accordingly, the trial court did not err in dismissing the case for lack of subject matter jurisdiction based on the ecclesiastical abstention doctrine.

*Affirmed.*

MAY, J., concurs.
WARNER, J., dissents with opinion.

WARNER, J., dissenting.

I respectfully dissent, as dismissal of this complaint was not required by the ecclesiastical abstention doctrine. Appellants argued that the case could be decided on neutral legal principles, and to determine otherwise goes beyond the four corners of the complaint. At best, therefore, dismissal was premature. The ecclesiastical abstention doctrine applies to church property disputes in hierarchical religious organizations. A different rule applies to churches which are congregational organizations. Based upon the correct rule, dismissal was error.

As noted in the majority opinion, this case involves a claim against third parties, the banks, for negligently transferring church bank accounts to the control of the deceased church pastor's wife after a schism in Church power. The Church claims that, with knowledge of the internal dispute, the banks transferred accounts to the wife, relying on "fraudulent documents" showing that the wife was entitled to possession of the accounts. In its complaint, the Church alleges that it "adheres to the congregationalist mode of Christian church governance." The banks moved to dismiss the complaint, alleging that the ecclesiastical abstention doctrine should be applied, because the court would have to determine matters of church governance. The court agreed and dismissed the case. The Church appeals.

The ecclesiastical abstention doctrine was first recognized by the U.S. Supreme Court in *Watson v. Jones,* 80 U.S. 679 (1871). The case arose from a schism in a Kentucky Presbyterian church after the Civil War. The Presbyterian Church in the United States is a hierarchical religious organization in which the local church is governed by the Presbytery comprising several churches in a geographical area. It in turn is governed by the Synod which is composed of all Presbyteries in a state or region. Finally, the national General Assembly is the highest governing body of the organization. *Id.* at 681–83.

Distilling a lengthy and complicated history of the case, the members of this Kentucky congregation had split into two groups, holding opposing positions on the war and slavery. *Id.* at 684 n.6. Each group elected Trustees of the Church. The General Assembly, however, had removed the trustees of one group and dropped them from the church rolls; an act that the removed group contended was not within the General Assembly's authority. The question thus posed in *Watson* concerned who owned and controlled the church property: the original church which was part of the hierarchical Presbyterian structure or the members of the church who had rejected General Assembly authority to remove their pastor and trustees.

4

The circuit court determined that the original church members were entitled to the church property pursuant to the regulations of the Presbyterian Church and the authority of the General Assembly.

Before the Supreme Court, the ousted members argued that the determination of the "ecclesiastical courts" (in this case the General Assembly) should not be accepted as conclusive by civil courts. In disputes regarding the right of property, civil courts should have the ability to examine whether the institution has adhered to its own principles and governing authority. In rejecting that contention, the Court set forth the principles for adjudicating cases regarding the rights to property held by religious organizations. It provided one rule for congregational organizations, independent of any supervisory organizational authority, and a different one for hierarchical organizations, such as the Presbyterian Church. The Court stated:

> The second class of cases which we have described has reference to the case of a church of a strictly congregational or independent organization, governed solely within itself, either by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government . . . .
>
> In such cases where there is a schism which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations. If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property. If there be within the congregation officers in whom are vested the powers of such control, then those who adhere to the acknowledged organism by which the body is governed are entitled to the use of the property.
>
>         . . . .
>
> But the third of these classes of cases is the one which is oftenest found in the courts, and which, with reference to the number and difficulty of the questions involved, and to other considerations, is every way the most important.
>
> It is the case of property acquired in any of the usual modes for the general use of a religious congregation which is itself

5

part of a large and general organization of some religious denomination, with which it is more or less intimately connected by religious views and ecclesiastical government.

. . . .

In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

*Id.* at 724–27.

To simplify these holdings, in cases involving churches that follow a congregational form of government, civil courts should decide church property disputes by ordinary principles of association law. This generally will result in a majority rule determination of which side of a church schism controls the property. Where a church is part of a hierarchical organization, decisions by the highest tribunal of the organization must be accepted as final in the civil courts for church property disputes.[2]

The Florida Supreme Court adhered to these principles in *St. John's Presbytery v. Central Presbyterian Church of St. Petersburg*, 102 So. 2d 714, 718 (Fla. 1958), a case involving a hierarchical church:

When the church is representative, republican or episcopal in government, the authorities uniformly hold that the church property whether held by an express or an implied trust

---

[2] Although many courts have treated the ecclesiastical abstention doctrine as a question of subject matter jurisdiction, I do not think that is the proper understanding of the doctrine. The civil courts have jurisdiction over the dispute but are bound by the decision of the highest ecclesiastical court. For instance, in *Watson* the federal circuit court did not dismiss the dispute based upon the doctrine. Instead, being bound by the decision of the General Assembly, it entered judgment declaring the General Assembly-supported members as the owners of the church property and enjoining the removed members from possession of any property. *Watson v. Jones,* 80 U.S. at 699–701. This was the decision affirmed by the Supreme Court. *Id.* at 735.

cannot be diverted from the parent church by those who withdraw from it and form a separate denomination. It matters not whether those who withdraw from the mother church constitute a majority or a minority faction, the church property remains with the mother church. *There are exceptions to this rule when the schism occurs in a church whose government is congregational in form like the Baptist or Congregational denominations* but in churches bound together by associated ecclesiastical government when the local church is obedient to a larger or more important religious organization and is governed by it, such as the Presbyterian, Catholic, Episcopal, Methodist and Lutheran, I have found no exception to this rule. They could not function under any other rule.

(emphasis supplied). The court reiterated the difference between hierarchical religious organizations and organizations following the congregational form of government in *Mills v. Ballwin*, 362 So. 2d 2 (Fla. 1978), *vacated*, 443 U.S. 914 (1979), *reinstated* 377 So. 2d 971 (Fla. 1980). The court quashed a decision by the First District determining that whether the church was hierarchical or congregational was immaterial to the property dispute arising out of the church schism. The supreme court disagreed and held that the hierarchical nature of the church controlled the disposition of the property. *Id.* at 7.

Florida appellate courts have applied the *Watson* rule with respect to churches of congregational organization. For instance, in *New Magnolia Baptist Church, Inc. of Branford v. Ellerker*, 353 So. 2d 204, 205 (Fla. 1st DCA 1977), the court said:

This case involves a dispute between two factions of a congregational, as distinguished from a hierarchical church. (*See Baldwin v. Mills*, 344 So. 2d 259 (Fla. 1st DCA 1977) and cases therein cited) Although civil courts may not constitutionally delve into matters of an ecclesiastic nature they have the right, indeed the duty, of applying and enforcing sterile principles of property law. (*Baldwin v. Mills, supra*).

In *Carroll v. Fellure*, 185 So. 2d 768, 769 (Fla. 1st DCA 1966), a church had joined the National Association of Free Will Baptists. When the association revoked the church pastor's credentials, a majority of the church voted to leave the association, and a minority sought to stay, filing suit to divest the majority of title to the church property. Defendants counterclaimed seeking an adjudication of their right to the church

property. The decisive issue in the case was the form of government of the church—whether congregational or hierarchical. After a trial, the chancellor determined that the church was independent and congregational, and the majority had a right to withdraw from the association and thus held title to the church property. In approving the chancellor's decision, the court noted that it was based upon a review of the church's rules and by-laws as well as the by-laws of the association which expressly stated that local churches were independent congregations. *Id.* at 769. The court cited to multiple other Florida cases confirming that the Baptist Church had a congregational form of government. *Id.* at 770; *see Epperson v. Myers*, 58 So. 2d 150 (1952); *First Indep. Missionary Baptist Church of Chosen v. McMillan*, 153 So. 2d 337 (1963); *Austin v. Mt. Zion Primitive Baptist Church of West Palm Beach*, 165 So. 2d 412 (1964).

Thus, the form of church government is critical to determining the role of the civil courts in disputes involving church property. Where that form of government is congregational, the court applies neutral principles of law to decide the issue, and if those are insufficient, then the rule of the majority. While the Church argued in the trial court and in this Court that the court can apply neutral principles of law to determine these issues, the trial court applied principles applicable only to a hierarchical organization and improperly dismissed this case.

The majority relies on *Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Seminole Tribe of Florida* (*Eglise II*), 824 F. App'x 680 (11th Cir. 2020), as authority for its decision. First, the appellate courts of this state are bound only by decisions of the United States Supreme Court and not by decisions of other federal courts. *See Pignato v. Great Western Bank*, 664 So. 2d 1011 (Fla. 4th DCA 1995). Second, the Eleventh Circuit did not follow *Watson*, which was the applicable federal law regarding the extent of civil court authority to decide issues regarding property disputes involving churches with a congregational form of government. It relied on *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), which was a religious dispute involving a hierarchical church organization. The *Milivojevich* Court not only commenced its analysis with the principle of *Watson* relating to hierarchical church organization, it detailed at length in a footnote the evidence that the church was in fact part of a hierarchical organization. *Id.* at 715 n.9. The Eleventh Circuit opinion in *Eglise II* even quoted a portion of the opinion which limits the rule to hierarchical churches: "[W]e 'are bound to accept the decisions of the highest judicatories of a religious organization of *hierarchical polity* on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law.' *Milivojevich*, 426 U.S.

8

at 713, 96 S.Ct. 2372." *Id.* at 683 (emphasis supplied). Thus, the court applied the wrong law to a church with a congregational form of government.

There is no evidence in this record to show that the Church is a member of a hierarchical body. Thus, there is also no evidence that there is a higher tribunal to decide issues involving the Church property. By abstaining from this dispute, we are leaving the parties to extra-legal means to decide issues involving Church property, like the ownership of the bank accounts at issue in this case. That is not a solution, and the parties are entitled to resort to the civil courts to determine the issue based upon neutral principles of law, or if those are not determinative, then majority rule, in accordance with both federal and state law. No governing rules or by-laws of the congregation are part of the record which might show who has authority over the congregation's property and resolve the question. Nor is it established that a majority of the congregation has determined any of the issues with respect to church government. Evidence may be produced on any of these issues which would show that the defendant banks were authorized to transfer the accounts as they did, but it was premature to dismiss the case against the banks on the basis of ecclesiastical abstention.

The Church argued that this case did not require the application of ecclesiastical doctrine and it could be decided on neutral principles of law. That is the standard to be applied to churches with a congregational form of government. The Church was correct, and the court prematurely dismissed the complaint.

*       *       *

***Not final until disposition of timely filed motion for rehearing.***

9