SAMUEL J. McNEILLY & others *vs.* FIRST PRESBYTERIAN CHURCH IN BROOKLINE & others.

Suffolk. October 20, 1922. — January 2, 1923.

Present: RUGG, C.J., BRALEY, PIERCE, CARROLL, & JENNEY, JJ.

*Religious Society. Corporation,* Religious. *Church. Equity Jurisdiction,* Suit relating to use of property by religious corporation.

A religious society, incorporated in 1896 under Pub. Sts. c. 38, §§ 24–26, under the denominational name Presbyterian, which has received gifts and donations not subject to any express trust or condition, is entitled under art. 11 of the Amendments to the Constitution of the Commonwealth against the objection of a minority of its members and of the members of a Presbyterian church connected and associated in public worship with it, to elect a pastor by a majority vote of its members under an amendment to its by-laws, previously adopted in due form at the same meeting at which the election took place, and to use the corporate property for the conducting of religious services under his leadership and for a manse for his use, although a by-law of the corporation provides that "Its discipline, doctrine and worship shall be that of the Presbyterian Church in the United States of America as held by the General Assembly of that Church," and, under the discipline and government of the Presbyterian Church in the United States, the person so chosen as pastor by the society could not become a pastor of a Presbyterian church.

BILL IN EQUITY, filed in the Supreme Judicial Court on May 8, 1922, and afterwards amended, by "members and communicants in good standing" of a church organized in Brookline in 1894, by

and with the approval of the Presbytery of Boston of the Presbyterian Church in the United States of America, who alleged that they brought the bill "in behalf of other parties in interest against the First Presbyterian Church in Brookline, a religious society duly organized and incorporated" in 1896 and against certain of its members and officers. The prayers of the bill were that the defendants "be enjoined from using any of the real and personal property of the corporation except in accordance with the government, discipline, doctrine, and worship of the Presbyterian Church in the United States of America as held by the General Assembly of that Church;" from allowing one Edwin Curtis to preach or conduct religious services in the church edifice or to occupy the manse except with the approval of the Presbytery of Boston; "from paying to said Curtis any money of the corporation either as salary or otherwise, except for such services as have been or may hereafter be rendered by said Curtis by and with the consent of the Presbytery of Boston;" and that, "until a pastor shall be duly installed in the Church by the Presbytery of Boston," the defendants "be enjoined from, in any way, interfering with the ministers sent by the Presbytery of Boston to fill the pulpit or to conduct religious services in the said church edifice."

The suit was reserved by *De Courcy,* J., upon the pleadings and a case stated for determination by the full court. Material facts are described in the opinion.

Article 11 of the Amendments to the Constitution of the Commonwealth reads as follows:

"Instead of the third article of the bill of rights, the following modification and amendment thereof is substituted: —

" As the public worship of God and instructions in piety, religion, and morality, promote the happiness and prosperity of a people, and the security of a republican government; therefore, the several religious societies of this commonwealth, whether corporate or unincorporate, at any meeting legally warned and holden for that purpose, shall ever have the right to elect their pastors or religious teachers, to contract with them for their support, to raise money for erecting and repairing houses for public worship, for the maintenance of religious instruction, and for the payment of necessary expenses; and all persons belonging to any religious society shall be taken and held to be members, until they shall

file with the clerk of such society a written notice, declaring the dissolution of their membership, and thenceforth shall not be liable for any grant or contract which may be thereafter made, or entered into by such society; and all religious sects and denominations, demeaning themselves peaceably, and as good citizens of the commonwealth, shall be equally under the protection of the law; and no subordination of any one sect or denomination to another shall ever be established by law."

Pub. Sts. c. 38, §§ 2, 3, 5, 24 (see now G. L. c. 67, §§ 2-4, 21), were as follows:

"Section 2. Religious societies, whether corporate or unincorporate, shall continue to have and enjoy their existing rights, privileges, and immunities, except so far as the same may be limited or modified by the provisions of this chapter.

"Section 3. The respective churches connected and associated in public worship with such religious societies shall continue to have, exercise, and enjoy all their accustomed privileges and liberties respecting divine worship, church order, and discipline, and shall be encouraged in the peaceable and regular enjoyment and practice thereof."

"Section 5. A religious society may make by-laws not repugnant to the laws of the commonwealth, and may in such by-laws prescribe the manner in which persons may become members."

"Section 24. A religious society that is not incorporated, may, if it contains ten or more qualified voters, organize and become a corporation, with the powers, privileges, duties, and liabilities of such societies, and may hold so much real and personal estate as may be necessary for the objects of such organization, and no more."

*D. A. Rollins*, for the plaintiffs.

*J. H. Morson*, for the defendants.

RUGG, C. J. This is a suit in equity brought by certain members of the First Presbyterian Church in Brookline, in behalf of themselves and others in interest, against the religious society incorporated under that name and certain persons who are members and trustees of that religious society. Before stating the nature of the present controversy, brief reference will be made to the Presbyterian church established in the United States as set forth in the record. The ecclesiastical organization of that denomina-

tion consists of five integral bodies or organizations, all of which, except the church and congregation, are called ecclesiastical courts or judicatories.

(1) The church and congregation consist of a number of persons, believing in the doctrines, worship, discipline, church order, and ordinances of Presbyterianism, associated for the purpose of conducting and maintaining public worship. The congregation is composed of members in full communion, who have made public confession of faith, have been received as members, are entitled to the sacraments and subject to the discipline of the church, and adherents who, although not members, attend church with some degree of regularity and contribute to its support.

(2) The session is composed of two or more men, elected from their own number by the members in full communion of the church and designated elders, and the regularly installed pastor, or, if there be none, a member of the presbytery by it designated for that purpose. The session has charge of the spiritual welfare of the congregation and the right to direct and control the use of the church edifice or building used for purposes of worship.

(3) The presbytery consists of all the regularly installed pastors of the Presbyterian churches within a designated territory (being approximately greater Boston in the case at bar), Presbyterian ministers residing therein not acting as pastors, and one elder from each church therein elected by its session.

(4) The synod comprises the ministers and elders composing at least three presbyteries or representatives thereof, New England being the synodical district for this part of the country.

(5) The general assembly consists of an equal delegation of ministers and elders from each presbytery in the United States in proportion to size. An appeal may be maintained from the session to the presbytery, from the presbytery to the synod, and from the synod to the general assembly, the decision of the superior ecclesiastical judicatory being binding upon all those inferior to it.

So far as appears, all these five bodies may be voluntary unincorporated associations, established for the maintenance of the ecclesiastical tenets, practices, and discipline of the denomination.

At the times here material Brookline was within the territorial jurisdiction of the Boston presbytery. The facts respecting the particular church involved in this controversy are that in January,

1894, certain persons in Brookline and its vicinity petitioned the presbytery of Boston to organize a Presbyterian church in Brookline. Such church was organized in May, 1894, by the Boston presbytery in accordance with the ecclesiastical polity of the Presbyterian church of the United States of America. Since its organization in 1894 until 1922 the Brookline church as a spiritual body organized by the Boston presbytery has continued to exist and to maintain public worship in accordance with the government, discipline, doctrine, and worship of the Presbyterian church in the United States of America and has participated in the administration of the several judicatories of that church pursuant to its rights and privileges. This will hereafter be designated as the church.

In February, 1895, at a meeting of the congregation it was voted "to raise funds for a permanent place of worship," and something over $1,000 was raised for that purpose prior to April 29, 1896. On that date a religious society under the name of the First Presbyterian Church in Brookline was incorporated under Pub. Sts. c. 38, §§ 24–26 (see now G. L. c. 67, §§ 21–23). This religious society hereafter will be designated the corporation. It adopted certain by-laws, the second of which was, "Its discipline, doctrine and worship shall be that of the Presbyterian Church in the United States of America as held by the General Assembly of that Church." On the following day the corporation acquired title to land in Brookline with a dwelling house thereon, the purchase price of which was paid in part by the $1,000 theretofore raised. The deed to the corporation contained no trust or condition of any kind. A church building was erected on this lot and used for public worship. This property was sold in 1912 and its proceeds used in part toward the reduction of a mortgage on other church property bought in 1910, since used for public worship. The deed of conveyance of this property also was in fee simple and contained no trust or conditions. Payment for this property was made in part by subscriptions and bequests of persons who were members in full communion of the church and in part by assumption of a mortgage. In 1921 a dwelling house was purchased by the corporation and known thereafter as the manse, the deed thereof being in fee simple without trust or condition. Gifts and legacies of considerable sums have come to the corpora-

tion free from express trust or condition. All members of the corporation are members of the church in full communion and a great majority, though not all, of the members of the church in full communion are members of the corporation.

The present controversy arises out of disagreements between the Boston presbytery and the Brookline church and corporation concerning its pastor. Rev. Edwin Curtis, a Congregational minister in and a citizen of Great Britain, supplied the pulpit of the Brookline church for a time under conditions consonant with Presbyterian polity. Thereafter in February, 1921, at a lawful meeting of the congregation of the Brookline church, a call was voted to be extended to Rev. Mr. Curtis to become its pastor. In conformity to the requirements of the Presbyterian polity a record thereof was made and transmitted to the Boston presbytery for its action, which alone has the power to extend a call to become such pastor. The Boston presbytery voted that Mr. Curtis be received on probation until February, 1922. In February, 1922, the Boston presbytery voted not to receive Mr. Curtis into the presbytery and that he terminate his relation with the Brookline church April 1, 1922. According to the polity of the Presbyterian church, an evangelical minister (who is not a Presbyterian minister) from a foreign country cannot be received except conditionally, nor be installed as minister until he has been on probation for one year. The presbytery has power to refuse to forward a call of a congregation to any minister and at any time may dissolve the pastoral relation without consent of church or congregation. A Presbyterian church cannot extend a valid call to a minister not of that sect coming from a foreign country until the expiration of such year of probation. No minister whatever can accept a call to a Presbyterian church until he has been unconditionally received by and becomes a member of the presbytery to which such church belongs. Thus it appears that Rev. Mr. Curtis, although he had served the probationary period, could not become pastor of the Brookline church according to the Presbyterian polity because the Boston presbytery declined to receive him unconditionally and permit him to become a member of it and because it refused to approve and extend a call to him to become pastor of the Brookline church but voted that his relations with that church terminate at a specified date.

Thereupon, at the annual meeting of the corporation of the Brookline Presbyterian religious society, held on April 12, 1922, upon a sufficient warrant duly warned, it was voted to amend its by-laws by inserting a new article to the effect that "Any pastor or minister who shall have been regularly ordained according to the rules, customs, usages or practices of any Evangelical church or denomination shall be eligible for election as pastor or minister of this church or society. He shall be elected annually by this society and for a term of one year." At the same meeting Rev. Mr. Curtis was elected pastor for one year. Communication of this election was made to the Boston presbytery. It is agreed that the Boston presbytery intends to take no action thereon. It further is agreed and it is manifest that the election and call of a pastor on April 12, 1922, by the corporation does not constitute a call according to the government and discipline of the Presbyterian church. Notwithstanding these facts Rev. Mr. Curtis has continued to act as pastor and to occupy the manse. Demand was duly made prior to the bringing of this suit upon the proper officers of the corporation and of the session of the church to take action to stop and prevent the alleged unlawful use of the property of the corporation and other alleged unlawful acts in connection with the retention of Rev. Mr. Curtis as minister. Such demand was refused.

The concurrence of a religious society incorporated under statutes and a church for the observance of sacraments is familiar in the history of this Commonwealth where the congregational form of church government was chiefly prevalent in the earlier days. The corporation was the legal entity which held the title to the real and personal estate used for worship and other religious purposes in the absence of express provision to the contrary. The church was the body of communicants gathered in the church membership for the celebration of the Lord's Supper and for mutual support and edification in piety, morality and religious observances. The corporation and the church, although indissolubly associated, were nevertheless separated by this distinct line of demarcation. The practical result of this principle was that in case of disagreement between the corporation and the church, the power of the corporation prevailed. *Stebbins* v. *Jennings*, 10 Pick. 172. *Baker* v. *Fales*, 16 Mass. 488. *Attorney*

*General* v. *Federal Street Meeting-house,* 3 Gray, 1. *In re New South Meeting House in Boston,* 13 Allen, 497. *Old South Society in Boston* v. *Crocker,* 119 Mass. 1. *Attorney General* v. *Armstrong,* 231 Mass. 196, 206. See *Parker* v. *May,* 5 Cush. 336.

It now is thoroughly settled that a gift to a church generally creates a public charity. *Sears* v. *Attorney General,* 193 Mass. 551, and cases there collected and reviewed. *Chase* v. *Dickey,* 212 Mass. 555, 566. The word "church" in this connection includes an incorporated religious society as well as the narrower definition to which allusion already has been made.

It follows that the gifts to the corporation in the case at bar whereby it was enabled to acquire land, a meeting-house and a manse, were gifts to a valid public charity. None of these gifts were made upon any express trust. They simply were handed over to the corporation with only the implications which arise by law from such donations.

The facts as to the collection of money, the establishment of the church and the organization of the corporation are indistinguishable in their legal aspects from those appearing in litigation concerning the religious society before this court in *Warner* v. *Bowdoin Square Baptist Society,* 148 Mass. 400. It there was said by Mr. Justice Holmes at page 404, "It is too well settled to admit of argument, that the foregoing facts do not make the legal corporation a trustee for the church." Rights of pew holders and differences of ecclesiastical government involved in that case do not affect the binding force of that decision as to the case at bar upon this point. There is no controversy between the Brookline church and corporation. They are in harmony. The great majority are in favor of the continuance of the pastoral relation between themselves and Rev. Mr. Curtis.

No question has been raised as to the interest of the plaintiffs or that they are not entitled to maintain the suit. That is therefore assumed in their favor without discussion. *Krauthoff* v. *Attorney General,* 240 Mass. 88, 92.

The precise question is whether the minority both of corporation and church, including some of the officers, have a right to appeal to the courts to enforce observance by the corporation and church of the ecclesiastical polity of the Presbyterian denomination respecting the call of a minister and to compel the expul-

sion of a minister not called and settled in accordance with that polity even though the majority desire his continued ministration.

The decision of that question cannot be predicated upon any express trust by donors that their benefactions shall be used only for the support of religious worship according to the tenets, practices, forms and discipline of any particular denomination. Therefore cases like *Chase* v. *Dickey,* 212 Mass. 555, *Attorney General* v. *Armstrong,* 231 Mass. 196, and *Eustace* v. *Dickey,* 240 Mass. 55, have no pertinency. No such trust is shown in the case at bar because the gifts were all to the corporation without express trust or condition of any kind. These gifts being thus free from express trust or limitation, must be held to have been intended for the promotion of the purposes for which the corporation was instituted and subject to all the conditions thereby imported by the nature of the donee. The corporation is a creature of the law. It possesses those powers, is subject to the obligations and enjoys the immunities and privileges conferred upon it by the law of the land. A religious society, when it becomes a corporation, rests upon the foundation established for it by the law. The corporation defendant in the case at bar was organized as a religious society under the general laws of this Commonwealth. One provision of art. 3 of the Declaration of Rights of our Constitution continued in art. 11 of its amendments is that the several "religious societies of this Commonwealth . . . shall ever have the right to elect their pastors or religious teachers." Concerning this provision it was said in *Baker* v. *Fales,* 16 Mass. 488, at page 508, "This is too explicit to admit of cavilling or to require explanation, as every constitutional provision for the security of civil or religious liberty ought to be. All preëxisting laws or usages must bow before this fundamental expression of the public will; and however convenient or useful it might be to continue the old form of electing or settling a minister, whenever a parish determines to assert its constitutional authority, there is no power in the State to oppose their claim." These words are of necessity equally applicable to a religious society. The authority of that decision upon this point is unimpaired and must remain so while this provision of the Constitution continues. Gifts and donations to a religious society, when free from express trust or condition, must be presumed to have been made in view of this constitutional guaranty.

That clause of the Constitution is an expression of the principle of democracy in concrete application to religious organizations. Its antecedents run far back into the history of the struggle for religious freedom, and its development was not complete until the adoption of art. 11 of the amendments in 1833. See *Opinion of the Justices*, 214 Mass. 599. That constitutional guaranty secures against implied restrictions the tendency to change and modification in creeds and statements of belief and affords opportunity for evolution of religious thought through freedom in choice of religious teachers. It relieves religious societies from difficulties as to interpretation of ancient forms of expression of denominational views, *Smyth* v. *Phillips Academy*, 154 Mass. 551, by the simple expedient of permitting them, through the usual means of the rule of the majority, freely to select their expounders of religious conceptions.

The corporation in the case at bar was organized long after the adoption of the Eleventh Amendment to the Constitution and upon plainest principles came into existence subject to its terms as clearly as if its words had been written into its charter. *Commissioner of Banks* v. *Prudential Trust Co.* 242 Mass. 78, 88. *Cosmopolitan Trust Co.* v. *Mitchell*, 242 Mass. 95, 113, and cases collected in each. The donors who contributed to the purchase of the land and the erection of the church edifice without specification of trust must be held to have done so subject to the constitutional guaranty to the corporation to select its minister. The same is true of the testators whose legacies have been likewise unrestricted in terms.

The simple declaration implied from the name and from the adoption of the by-laws by the corporation that the polity of a particular denomination as to the selection of ministers would be followed, cannot be regarded as an abandonment of its constitutional powers. It does not convert free gifts into gifts upon an implied trust that such polity shall be observed. These gifts were to the corporation upon the charity that they should be employed in general for the worship of God. There is no contention that the general charity for which the corporation was organized has been perverted in any other particular than in the selection of the minister. For the reasons stated, that was the exercise of a constitutional right to which all general and unspecified gifts

were made subject. The present majority of the corporation constitute its dominating power by regular succession and in due order. There is no such trust imposed on the property as requires inquiry into the conformity of present members, or the regularity of the corporate action brought about by them, to the views of ministerial call entertained by the great body of Presbyterians or established by the ecclesiastical polity of that denomination. See *Watson* v. *Jones*, 13 Wall. 679, 724, 725; *Robertson* v. *Bullions*, 11 N. Y. 243, 246; *Keyser* v. *Stansifer*, 6 Ohio, 363; *Bartlett* v. *Hipkins*, 76 Md. 5; *Smith* v. *Nelson*, 18 Vt. 511; *Westminster Presbyterian Church* v. *Presbytery of New York*, 211 N. Y. 214, 220.

We have no occasion to discuss the governing principles of law respecting schism or other religious controversies. We confine ourselves to the point here necessarily involved.

Our Constitution and laws are so explicit in this respect as to render unnecessary a review of decisions from other jurisdictions. See *Lindstrom* v. *Tell*, 131 Minn. 203; *Hale* v. *Everett*, 53 N. H. 9; *Kicinko* v. *Petruska*, 259 Penn. St. 1; *Watson* v. *Jones*, 13 Wall. 679, 726–734; *Shepard* v. *Barkley*, 247 U. S. 1, and cases there collected.

*Bill dismissed without costs.*