**MASTER et al. v. SECOND PARISH OF PORTLAND et al. (CONGREGATIONAL-CHRISTIAN CONFERENCE OF MAINE, Intervenor).**

**No. 1020.**

District Court, D. Maine, S. D.
April 30, 1940.

Supplemental Opinion Feb. 12, 1941.

Clement F. Robinson and ·Nathan W. Thompson, both of Portland, Me., for plaintiffs.

Frank P. Preti, F. J. Laughlin, and Daniel C. McDonald, all of Portland, Me., for defendants.

Chas. H. Blatchford, of Portland, Me, for intervenor.

PETERS, District Judge.

This is a bill in equity, brought before the present Rules took effect, in which the plaintiffs are members and representatives of the large ecclesiastical organization known as the Presbyterian Church in the United States of America, and there are named as defendants the Second Parish in the Town of Portland and the First Presbyterian Society of Portland. The Congregational-Christian Conference of Maine was also permitted to intervene as a defendant. These and various other persons and organizations named as parties in the bill are often referred to in the record by other than their correct names, but the above are the essential parties and described by their legal names.

The principal object of the proceeding is to establish the authority of the Presbyterian Church in the United States of America over property now held by the Second Parish in the Town of Portland, and especially to obtain the enjoyment of the use of the church building of that Parish, and the opportunity to install a pastor acceptable to the Presbyterian organization represented by the individual plaintiffs.

I find the facts to be as follows:

The Presbyterian Church in the United States of America, hereinafter for convenience referred to as the plaintiff church, is a large, national, voluntary religious organization, comprising many churches of the Presbyterian denomination throughout the country, united in a common religious belief and form of worship, and having an organization which embraces the various churches and congregations, all of which are subject to the authority of other ecclesiastical bodies called judicatories, with the final authority vested in the General Assembly of the Presbyterian Church in the United States of America.

The executive body of each church or congregation is called a Session, which seems to have the functions of an executive committee. It is composed of members of the congregation, elected by it, called ruling elders, together with the regularly installed pastor who is ex officio the moderator. To constitute a Session there must be at least one ruling elder and the pastor. The Session has charge of the spiritual welfare of the congregation and the right to control the use of the property of the church for the purposes of worship.

Next above the Session in the organization is the Presbytery, consisting of all the ministers,—in number not less than five,—and one ruling elder from each congregation within a certain district. Subject to appeal, the Presbytery has jurisdiction over the churches in its district. The Session of any regular Presbyterian Church in Portland is subject to the authority of the Presbytery of Newburyport.

The Synod, which exercises jurisdiction over the Presbyteries, is a convention of ministers and elders within a larger district.

The General Assembly is the highest judicatory and represents in one body all the particular churches in the denomination. It consists of a delegation of ministers and elders from each Presbytery.

The pastor may be nominated by the congregation but he is appointed by and derives his authority from the Presbytery of the district.

It so happens that litigation in the courts has many times made necessary a description of the organization and form of government of the Presbyterian Church, especially in the Federal Courts in cases like Watson v. Jones, 13 Wall. 679, 20 L.Ed. 666; Barkley v. Hayes, D.C., 208 F. 319; Shepard v. Barkley, 247 U.S. 1, 38 S.Ct. 422, 62 L.Ed. 939.

There being no dispute between the parties as to the organization or methods of discipline and procedure in the Presbyterian Church, as set forth in the cases above referred to and many other decisions therein mentioned, no further explanation or finding in that respect seems necessary here.

The Park Street Presbyterian Church in Portland was the name commonly used to designate the organization, the legal name of which is the First Presbyterian Society of Portland, above named as defendant. As a corporation it held the title to the real estate. It will be less confusing to refer to it as the Park Street Church. It was for many years a unit of the Presbyterian organization in good and regular standing. It owned real estate consisting of the church building and land on which it stood. The use and control of the Park Street property were wholly in the control of the congregation acting through its Session, subject to the oversight of the Presbytery, and, on appeal, the Synod and General Assembly.

The principal defendant here is the Second Parish in the Town of Portland, a Congregational parish which owned the church edifice on Congress Street in Portland, the right to the use of which is in dispute. For convenience this may be referred to as the Congress Street Church to distinguish it from the Presbyterian Church on Park Street.

This parish was incorporated in 1788 under the name of the Second Parish in the Town of Portland, by an Act of the Massachusetts General Court, as "a distinct and separate religious society * * * with all the privileges, powers and immunities which any parish in this Commonwealth is entitled to by law." No other purposes were mentioned.

In accordance with the Congregational polity, this church congregation was composed of members professing the Congregational faith, with the parish as a separate corporate organization holding title to the property and having full charge of the business of the church.

The deed of conveyance of the Congress Street Church property to the parish was without any condition affecting the use of the property and did not purport to create any express trust. It was a simple deed to the Second Parish in the Town of Portland, its successors and assigns forever.

The Parish also held in trust certain funds the income of which was to be used for the support of its minister.

In the year 1923 both the Park Street and the Congress Street bodies were having financial difficulties. The Congress Street people had no minister, their property was subject to debts, and church services had been suspended. The Park Street church was functioning with a pastor, but resources were diminishing. Its property was not so valuable as that of the Congress Street Church.

Suggestions as to a union between the two churches began as early as 1920, culminating in 1923 in an agreement to unite, which was put in written form and ratified by all interested parties, including the Presbytery of Newburyport, the judicatory having immediate jurisdiction over the Park Street Church. The agreement, leaving out the formal parts, is as follows:

"Whereas, the respective parties hereto have duly voted and agreed to unite in order to form one religious body to be known as the Second Parish Presbyterian Church to occupy and use the edifice and property of the Second Parish of Portland.

"Now this Agreement witnesseth that in consideration of the premises and the mutual payment and receipt of one dollar ($1.00) and other good and valuable consideration it is agreed as follows:

"1. That the parties hereto hereby unite.

"2. That the second party hereby agrees that its church property at the corner of Park and Pleasant Streets in the City of Portland, Maine, be sold and the proceeds of such sale applied

"(a) To liquidate the indebtedness of both uniting corporations,

"(b) The balance after liquidation of said indebtedness to constitute a trust fund, the income of which shall be used to support the work of the Second Parish Presbyterian Church.

"3. The edifice and property, including all trust funds, of the first party, shall be occupied and used for the purposes of said Second Parish Presbyterian Church.

"4. In the event of both the dissolution of said Second Parish of Portland (or its successor or successors) and the abandonment of its property or of any other acquired or substituted property for church purposes (both contingencies and not one), the proceeds shall revert to and be divided between the Congregationalist and Presbyterian denominations in proportion to their present valuation and contributions.

"5. That the property known as 'The Manse' at No. 72 Winslow Street, in said City of Portland, shall, so soon as convenient after the completion of this union hereby effected, be conveyed by proper deed of conveyance to said first party; and all other steps, legal and otherwise, necessary or advisable to carry this agreement into full effect, shall be taken and are hereby authorized.

"6. The church members of the first party join the Presbyterian Church and the church members and contributors of the second party shall be elected members of the Second Parish of Portland, corporation.

"7. The present parish organization and name shall be retained.

"This agreement shall be binding upon the parties hereto, their assigns and successors."

This agreement was carried out without dissension. The Park Street property was

sold, the debts of that organization were paid, the congregation moved over to Congress Street and the debts of that parish were paid. The balance of the money was placed in the treasury of the Congress Street parish and used for the purposes of the united churches.

The church members of the Congress Street Church joined the Presbyterian Church and certain of the Presbyterian people were elected members of the Congress Street parish. The new name of Second Parish Presbyterian Church, under which the united congregations functioned, was used, the Presbyterian organization was continued and for thirteen years the Second Parish Presbyterian Church, composed of members of both former churches, was affiliated with and functioned in all respects as a unit of the Presbyterian Church in the United States of America under the immediate authority and jurisdiction of the Presbytery of Newburyport, as before.

The organization and name of the Second Parish in the Town of Portland, the corporation owning the Congress Street property, were retained and continued. After the merger it performed its functions as the property-holding and money-handling corporation in much the same way as before, the new Presbyterian religious organization taking the place of the former Congregational worshiping body. Members of the Parish manifested a definite intention to retain and continue the independent nature of that body. Prominent, long-time members of the Parish testified that it was not the intention that their parish corporation should be absorbed by the Presbyterian Church or otherwise change its status. On the other hand, they acquiesced in the co-operation of the Church and Session with the Presbyterian judicatories, and the parish cooperated whenever necessary in the operation of the ecclesiastical machinery affecting the Church.

The corporation which had held title to the Park Street property, the First Presbyterian Society of Portland, ceased functioning after the sale of its real estate, and became a mere shell, owning no property and attempting no activity.

The union of the two churches seems to have worked well until 1936, in which year, on June 21, the Session of the Second Parish Presbyterian Church, then functioning as such under the Presbyterian system, voted to call a special meeting of the church "for the purpose of considering what action, if any, the church will take in regard to severing our relations with the Presbyterian church in the U.S.A." Such a meeting was held on June 30, with the pastor presiding as moderator, when the following resolution was voted upon:

"Be it resolved that we, the Second Parish Presbyterian Church of Portland, Maine, do deplore the unpresbyterian actions of the 148th General Assembly of the Presbyterian Church in the U.S.A. Therefore, be it further resolved that this church does not desire to join in this departure from the faith of our Presbyterian forefathers; therefore we stand on the doctrinal basis on which this church has stood from its beginning, and declare that that body which has taken these actions has no longer any jurisdiction, control or authority over us. Be it further resolved that a copy of these resolutions be spread upon the minutes of this meeting and a copy be sent to the Presbytery of Newburyport."

The resolution was carried by a vote of 76 to 1. It was then voted, unanimously, to apply for admission in the Presbyterian Church of America, and such a connection was later formed.

A meeting of the defendant parish, that is, the Second Parish in the Town of Portland, the ancient Congregational corporate body,—which had agreed to the union of the two churches, reserving its own organization and name,—was also duly called and held on June 30, 1936. The meeting, having been called to order, was recessed "until after the religious organization, the Second Parish Presbyterian Church, has held its meeting". Whereupon the parish meeting reconvened and it was voted "That the Parish concur with the church in the action that the church has taken relative to change of organization, and to allow the use of the parish property to the Second Parish Presbyterian Church of the Presbyterian Church of America."

Following the above action of the church and the parish the clerk of the Session sent a copy of the resolution to the clerk of the Presbytery of Newburyport, accompanied by a personal letter expressing regret for the circumstances which gave rise to the action of the Portland people. The clerk of the Presbytery acknowledged receipt of the copy of the resolution, stated that he would present it for action at a special session of the Presbytery called for August 3, and intimated that there would be a costly law suit instituted immediately.

On August 1st the pastor of the Portland church wrote letters to the moderator and clerk of the Presbytery of Newburyport stating that he no longer regarded himself as under their jurisdiction. The special meeting of the Presbytery was held on August 3d, at which there were read communications from the Portland church and pastor. A recess of thirty minutes was taken, at the conclusion of which specifications having been formulated, charges were presented against the pastor of the Portland church and unanimously approved, and it was "voted to dissolve the pastoral relations existing between the Rev. John H. Skilton and the Second Parish Presbyterian Church of Portland, Maine; and the Rev. William MacDuffie was duly elected to preach and declare the pulpit vacant on Sunday, August 16th." A temporary organization or committee was set up to act as or in lieu of the regular session of the Portland church. It was more a committee than a session, as the session, other than the pastor, has to be elected by the congregation.

The Presbytery took no action on the notification that its jurisdiction was no longer recognized by the Portland church, other than immediately proceeding against the pastor. The explanation is that the action of the Portland church was not recognized by the Presbytery as legal in any respect. The attempted secession was regarded as a nullity. The action of the pastor, however, who had been originally designated by the Presbytery, was considered contumacious. Proceedings were taken against him personally and he was ousted from the plaintiff church, but continued to preach at the Portland church as before.

On August 3d Mr. MacDuffie wrote the clerk of the Portland Session that he planned to appear before the Session on August 16th to "preach a Gospel sermon and close by declaring the pulpit vacant". He was not permitted to accomplish that purpose, however, as the Portland Session authorized a reply to Mr. MacDuffie to the effect that "We are not now under the jurisdiction of the Presbyterian Church in the U. S.A. and will not permit a representative of Presbytery to appear in our pulpit for the purpose of declaring it vacant." This was the end of the ecclesiastical activities and the beginning of litigation in the courts.

The action of the Presbytery in dismissing the Portland pastor from the church and later unfrocking him, and the attempt-ed proceeding to declare the pulpit vacant, were all according to the Presbyterian constitution and practice. It also seems to be the practice under such circumstances to take no action against the Session. The Presbytery in such cases is animated by the hope that, as a result of supplying a minister to preach a sermon and the contact thus made with the congregation, the attitude of the congregation may be changed. The Portland church is technically regarded as an existing Presbyterian organization, but not functioning as such owing to the contumacy of individuals. It is still carried upon the roster of the plaintiff church.

Notwithstanding the action of the Presbytery in unfrocking its pastor, the Second Parish Presbyterian Church of Portland has continued to function with a minister of its own choosing, and resists the claims of the plaintiff church to use the Portland property or fill the pulpit. The attitude of the Portland church appears to represent the unanimous feeling of the individuals connected with it.

## Claims of the Parties.

The plaintiff church does not claim any breach of the written agreement of merger. Counsel stated his position to be that "the agreement is not breached, abrogated or at an end. Performance has been withheld by one of the parties". The plaintiff church "wants an opportunity to turn the clock back to 1936 and carry on from that point". Plaintiff seeks the beneficial use of the Congress Street property and claims "the right to put their minister in and preach the Presbyterian doctrine".

Specifically, the relief asked for is "That the defendant Parish be enjoined from permitting the use of its property other than for the benefit and according to the uses of the plaintiff denomination, to the end that the beneficial use shall be restored to the plaintiff".

The bill also prays that the defendants be enjoined from further performance of the votes of secession passed in 1936, but that request in that form is not pressed. It is also asked that the Rev. Mr. Skilton be enjoined from occupying the pulpit and conducting services on the Congress Street property. That particular pastor is no longer serving the church and the prayer is adequately covered by the one concerning the use of the property,—which is, substantially, that it be restored to the plaintiff Church and any session that may be organized with its authority.

The plaintiff does claim, however, that the funds derived from the sale of the Park Street Church, and turned over to the Congress Street Parish, were impressed with a trust in favor of the plaintiff, and that in the event that the use of the church itself is denied the plaintiff, there should be an accounting of those funds and payment made to the plaintiff.

The defendant, Second Parish in the Town of Portland, denies that it was the intention of the parties to the agreement that it should unite with the First Presbyterian Society, another corporation, and claims that it never did nor could so unite. It maintains that it has always preserved a separate corporate identity, free from any control of the Presbyterian judicatories.

It admits that the two churches or worshiping bodies united and that that union resulted in a Presbyterian Church, but denies that either by the merger agreement or by any subsequent action on its part it lost or impaired its title to the real estate or the right to control its use for religious purposes which it has always had, and especially that it did not, and could not, by the merger agreement or subsequently, create any trust for the benefit of the Presbyterian Church in the United States of America. This defendant also claims that under the constitution of Maine, which secures to all religious societies the right to select their own religious teachers,—including, as claimed, the right to the free use of the church property for preaching purposes,—the plaintiff church cannot interfere with the people of the Second Parish in the Town of Portland in the selection of a minister and his preaching in their church.

The intervening party, the Congregational-Christian Conference of Maine, has intervened for its interest under paragraph 4 of the merger agreement above set forth, as the intervenor represents the Congregational denomination in Maine. It claims that the Second Parish in the Town of Portland and the Second Parish Congregational Church, as an independent unit, by their actions in 1936, in attempting to terminate their relations with the plaintiff church and to become affiliated with another denomination, have ousted the beneficiaries for whose use the parish as trustee held the combined properties under the 1923 agreement; that because of the unauthorized change in the immediate beneficiary by the trustee the first object of the trust has been defeated and that proceedings should now be taken under the trust agreement, i. e., the merger agreement, which will result in the dissolution of the trustee parish and the division of the property, after an accounting, between the Congregational and Presbyterian denominations, under the provisions of paragraph 4.

## Conclusions of Law.

Speaking now only of the real estate, being the church edifice on Congress Street, the title to which is,—as it was for many years prior to 1923,—in the Second Parish in the Town of Portland, "a distinct and separate religious society with all privileges, powers and immunities which any parish" in the Commonwealth of Massachusetts was entitled to by law in 1788: In order to determine the present rights of all parties in the property, the nature of the title held by the Parish under its deed of conveyance must be determined.

As to this, it is claimed by counsel for the Parish that when the title was acquired it was impressed with a trust for the benefit of the Congregational church, on the ground that "all property owned by religious bodies is impressed with a trust for the benefit of the particular body or organization of which the organization owning it is a part", and that "the property cannot be transferred to another religious body whose doctrines or form of church government are fundamentally different from that in which it is held".

The plaintiff's counsel, on the other hand, claims that originally, and until 1923, the Parish was the absolute owner of the property under the old Congregational system, and "that by the merger agreement, interpreted in the light of its background, and put into effect for twelve years, the merged churches became a single Presbyterian institution, a judicatory of the plaintiff church denomination; with all the property of both organizations held in trust for the uses of that denomination".

As I view it, neither position is entirely sound. By decisions since earliest times in Massachusetts and Maine the status and functions of the parish in the Congregational polity have been well settled. The parish is the dominant partner in the Congregational church-parish system, so far as the property and business matters are concerned, and the parish makes all contracts and conveyances affecting the property of the organization.

When the parish, as the corporate body of the church, acquires title to property without any trust being expressed or particular use provided for, a public charity or religious trust is created, but not necessarily a trust for any particular denomination. The property must be used for religious purposes, but with considerable discretion in the parish as trustee as to what shall be embraced in that term.

"The concurrence of a religious society incorporated under statutes and a church for the observance of sacraments is familiar in the history of this Commonwealth where the congregational form of church government was chiefly prevalent in the earlier days. The corporation was the legal entity which held the title to the real and personal estate used for worship and other religious purposes in the absence of express provision to the contrary. The church was the body of communicants gathered in the church membership for the celebration of the Lord's Supper and for mutual support and edification in piety, morality and religious observances. The corporation and the church, although indissolubly associated, were nevertheless separated by this distinct line of demarcation. The practical result of this principle was that in case of disagreement between the corporation and the church, the power of the corporation prevailed. Stebbins v. Jennings, 10 Pick. 172; Baker v. Fales, 16 Mass. 488; Attorney General v. Federal Street Meeting-house, 3 Gray 1. In re New South Meeting-House in Boston, 13 Allen 497. Old South Society in Boston v. Crocker, 119 Mass. 1, 20 Am.Rep. 299; Attorney General v. Armstrong, 231 Mass. 196, 206, 120 N.E. 678. See Parker v. May, 5 Cush. 336.

It now is thoroughly settled that a gift to a church generally creates a public charity. Sears v. Attorney General, 193 Mass. 551, 79 N.E. 772, 9 Ann.Cas. 1200, and cases there collected and reviewed. Chase v. Dickey, 212 Mass. 555, 566, 99 N. E. 410. The word 'church' in this connection includes an incorporated religious society as well as the narrower definition to which allusion already has been made.

"It follows that the gifts to the corporation in the case at bar whereby it was enabled to acquire land, a meeting house and a manse, were gifts to a valid public charity. None of these gifts were made upon any express trust. They simply were handed over to the corporation with only the implications which arise by law from such donations.

"The facts as to the collection of money, the establishment of the church and the organization of the corporation are indistinguishable in their legal aspects from those appearing in litigation concerning the religious society before this court in Warner v. Bowdoin Square Baptist Society, 148 Mass. 400, 19 N.E. 403. It there was said by Mr. Justice Holmes at page 404 of 148 Mass., at page 403 of 19 N.E.: 'It is too well settled to admit of argument that the foregoing facts do not make the legal corporation a trustee for the church.' Rights of pew holders and differences of ecclesiastical government involved in that case do not affect the binding force of that decision as to the case at bar upon this point. There is no controversy between the Brookline church and corporation. They are in harmony. The great majority are in favor of the continuance of the pastoral relation between themselves and Rev. Mr. Curtis." McNeilly v. First Presbyterian Church, 243 Mass. 331–337, 137 N.E. 691, 694.

"The presumption arising from a deed to a church organization is that it was the intention of the grantor or, for that matter, the purchasers of the property, that the same be devoted to religious purposes in such a manner as the governing body should under its rules determine; and so long as any religious organization can be reasonably ascertained to be that governing body or its regular successor, it is entitled to be awarded the possession and use of the property". Zollmann on American Church Law, page 246.

It should be borne in mind that the property (real estate) here involved was not originally Presbyterian property. It only became such so far as the merger agreement made it so.

It is not a question as to which of two parties in a Presbyterian church shall have possession of Presbyterian property, as in a long line of cases like Watson v. Jones, 13 Wall. 679, 20 L.Ed. 666. The question is, to what extent did the agreement make it Presbyterian property and subject it to Presbyterian judicatory control?

Also, there is no division in this local, Portland church, still a Presbyterian church from its own point of view, though not, apparently, wholly agreeing with the doctrines of the plaintiff church. This local

926

congregation claims the right and desires to continue to have a minister of its own choosing in the pulpit of a church edifice which it has occupied with the consent of the owner from 1923 to 1936, and with the consent of the same corporation, still claiming to be the owner, since 1936.

There are other facts and other laws to be considered than those involved in the decisions in the Watson v. Jones series of cases. This parish held the property as trustee for religious purposes under the New England church system and subject to the laws and constitution of Maine. The merger agreement must be considered with that background.

The plaintiff would have it that, by the merger agreement, the Portland parish surrendered its independence and became a subject of the Presbyterian Church in the United States of America.

■ The plaintiff claims that by the merger agreement the property was permanently impressed with a trust for the benefit of the larger organization. But the property was already impressed with a trust for religious purposes generally. A trustee cannot by its sole action create another and narrower trust. He cannot change and reduce the scope of the purposes for which he held the property in trust.

The church, as a worshiping body at Portland, might well have become a judicatory of the plaintiff church and subject to its discipline. The situation of the parish, as a legal body holding the property as trustee for religious purposes, remains unchanged. The only thing the parish did or could do by the agreement was to permit the united bodies,—to be called the Second Parish Presbyterian Church,—to use the Congregational Church building.

■ The worshiping body has attempted to sever its connection with the larger Presbyterian body. Disputes arising from that situation cannot be gone into by the courts except as affecting the rights concerning property. The property rights are not dependent upon the validity of the attempted secession, nor upon the merger agreement as written. The Congress Street people,—both parish and church,—assert rights as a religious society independent of a connection with any other organization,— the right to choose their own pastor and use their building for his preaching. That brings up the question whether the merger agreement will prevent their doing so. All

the actual parties to the agreement are in accord. The parent body of the Presbyterian organization, however, comes in and asserts the right to select a pastor and install him in the local church. Such a right must grow out of the agreement, but the agreement must be construed subject to the Constitution of Maine,—as much so as if so stated in the instrument. The Constitution provides in art. 1, Section 3 that "All men have a natural and unalienable right to worship Almighty God according to the dictates of their own consciences, * * * and all religious societies in this State, whether incorporate or unincorporate, shall at all times have the exclusive right of electing their public teachers and contracting with them for their support and maintenance".

■ There can be no question that the words "public teachers" include pastors of a church. The provision is derived from the ancient Bill of Rights in Massachusetts and the Constitution thereupon founded; and in Baker v. Fales, 16 Mass. 488–509, it is said: "It has been supposed by counsel in the argument that there is a distinction between a publick teacher, whose election is thus provided for in the Declaration of Rights, and a minister or pastor of a church, in the ecclesiastical or clerical sense of these terms; and that although a civil contract may be made with the former, binding upon the parish, he is not vested with a religious character or office, so as to be entitled to the privileges of a minister of the gospel. But we see no ground for such distinction".

■ The constitutional provision applies to this and all other religious societies in this State. The suggestion that it applies only to the larger body, the Presbyterian judicatory, which selects pastors for the local churches of that denomination, is untenable. It is a matter of local self-government. The larger body, or judicatory, apparently does not require religious teachers for itself. It is composed of such teachers. If it did require teachers it could choose them for itself, if living in Maine. It cannot successfully assert any right, superior to the Constitution, of choosing for others.

As to the effect of such a constitutional provision, I regard the case of McNeilly v. First Presbyterian Church, 243 Mass. 331, 137 N.E. 691, 693, and the citations therein, as decisive of this point. That case was a much stronger one for the Presbyterian contention. That case involved only one

church which was organized and continued as a Presbyterian church, and became a part of the larger Presbyterian organization. Its by-laws provided that "Its discipline, doctrine and worship shall be that of the Presbyterian Church in the United States of America as held by the General Assembly of that Church." The society was organized as a corporation. It acquired land and built a church building. The deed to the corporation contained no trust or condition of any kind. A disagreement arose between the Presbytery and the Brookline church and corporation concerning its pastor. The local church insisted upon calling a pastor unacceptable to the Presbytery which declined to permit him to act. The pastor called by the local church continued to act and occupy the church property. Before bringing suit demand was made by the Presbytery upon the proper officers of the corporation and of the session of the church "to stop and prevent the alleged unlawful use of the property of the corporation and other alleged unlawful acts in connection with the retention of Rev. Mr. Curtis as minister. Such demand was refused." The Court said, among other things, that the decision of the question "cannot be predicated upon any express trust by donors that their benefactions shall be used only for the support of religious worship according to the tenets, practices, forms and discipline of any particular denomination. Therefore cases like Chase v. Dickey, 212 Mass. 555, 99 N.E. 410, Attorney General v. Armstrong, 231 Mass. 196, 120 N.E. 678, and Eustace v. Dickey, 240 Mass. 55, 132 N.E. 852, have no pertinency. No such trust is shown in the case at bar because the gifts were all to the corporation without express trust or condition of any kind. These gifts being thus free from express trust or limitation, must be held to have been intended for the promotion of the purposes for which the corporation was instituted and subject to all the conditions thereby imported by the nature of the donee. The corporation is a creature of the law. It possesses those powers, is subject to the obligations and enjoys the immunities and privileges conferred upon it by the law of the land. A religious society, when it becomes a corporation, rests upon the foundation established for it by the law. The corporation defendant in the case at bar was organized as a religious society under the general laws of this Commonwealth. One provision of part 1, art. 3 of the Bill of Rights of our

Constitution continued in article 11 of its amendments is that the several 'religious societies of this Commonwealth * * * shall ever have the right to elect their pastors or religious teachers.' Concerning this provision it was said in Baker v. Fales, 16 Mass. 488, at page 508: 'This is too explicit to admit of caviling or to require explanation; as every constitutional provision for the security of civil or religious liberty ought to be. All pre-existing laws or usages must bow before this fundamental expression of the public will; and however convenient or useful it might be to continue the old form of electing or settling a minister, whenever a parish determines to assert its constitutional authority, there is no power in the state to oppose their claim.' These words are of necessity equally applicable to a religious society. The authority of that decision upon this point is unimpaired and must remain so while this provision of the Constitution continues. Gifts and donations to a religious society, when free from express trust or condition, must be presumed to have been made in view of this constitutional guaranty. * * *

"There is no contention that the general charity for which the corporation was organized has been perverted in any other particular than in the selection of the minister. For the reasons stated, that was the exercise of a constitutional right to which all general and unspecified gifts were made subject. The present majority of the corporation constitute its dominating power by regular succession and in due order. There is no such trust imposed on the property as requires inquiry into the conformity of present members, or the regularity of the corporate action brought about by them, to the views of ministerial call entertained by the great body of Presbyterians or established by the ecclesiastical polity of that denomination."

Many other points have been raised by both sides and argued by counsel with much ability, but it is not necessary to discuss them as, in the face of the Constitutional provision upon which the defendant, the Second Parish in the Town of Portland, relies, no Court could issue an injunction to prevent its use of its property by a minister of its own selection.

This conclusion automatically disposes of the contentions of the intervening party which can receive nothing from the property until both the dissolution of the

holding corporation and the abandonment of its property have taken place.

All the prayers of the bill relating to the tangible church property and its appurtenances, above referred to, and affecting the choice of a pastor by the Second Parish in the Town of Portland, are denied.

The evidence at the trial of this case did not fully cover the matter of moneys received by one church from the sale of its property and paid over to the other to be used for the purposes of the amalgamated organization. This stands on a rather different footing from the real estate, and it may well be that a different rule will govern its final disposition. The case in that respect is retained for further evidence and possibly for the appointment of a master or auditor, as the situation may require or the parties may agree.

### Supplemental Opinion.

On a rehearing in the above case and after further exhaustive arguments, I am unable to change the conclusion I arrived at originally, that the plaintiff,—that is the organization called the Presbyterian Church in the United States of America,— is not entitled to any process whereby it may oust the people of the Second Parish in Portland from their meeting house or prevent them from hiring their own minister. That is the limit of my decision. In view of the arguments presented, however, it may not be out of place to add a few words in further clarification of my position.

The written agreement above referred to, also called the merger agreement, is, of course, the source of any rights the plaintiff has as well as the cause of this controversy. It should not be overlooked that the actual parties to the agreement are and always have been in accord. In the formal part of the agreement, not quoted above, it is stated to be entered into "by and between Second Parish of Portland, a corporation, party of the first part, and Park Street Presbyterian Church of Portland, a corporation, party of the second part.".

The worshipping members of each church as distinguished from the parish, or corporate body, became parties to the agreement in an informal way by voting to accept it and by signing it through their representatives; so it may be said that there are four parties to the agreement; but whether it is considered that there are two parties or four, they all adhere to the agreement and there is no dispute between them.

The plaintiff claims no breach of the agreement, expressly disclaiming such an attitude on its part. It says only that although not an actual party to the agreement, it acquired, as beneficiary under a trust created by the agreement, the right to the beneficial use of the property of the Second Parish in Portland, now as heretofore occupied by the two united congregations, the title, as always, being held by the corporate body, the Second Parish in the Town of Portland. The fact that the united congregations have changed their views as to the particular form of Presbyterianism they prefer to adhere to, is the cause of the desire of the plaintiff that the present worshippers should vacate their place of worship so that the plaintiff, as representative of the original Presbyterian body, may take control.

It is unnecessary to attempt to define the extent of the rights, if any, acquired by the plaintiff by implication under the agreement made between a member of its own organization and an independent congregational parish; and I doubt if it is profitable to pursue to possible attenuation the doctrine of religious trusts and its applicability here.

The parties differ in their view as to the nature of the title held by the incorporated religious body called the Second Parish in the Town of Portland. I think there can be no question that under the laws of Maine, as under the laws of Massachusetts when this parish was incorporated, and ever since, a religious society holds its property as a public charity or religious trust. It was said in the case of St. Michaels, etc., Church v. St. Michaels, etc., Church, 288 Mass. 258, 192 N.E. 628, 630, "the corporate organization of the plaintiff as a religious society impressed its property with a charitable trust, for religious purposes. Sears v. Attorney General, 193 Mass. 551, 79 N.E. 772, 9 Ann.Cas. 1200; Glaser v. Congregation Kehillath Israel, 263 Mass. 435, 439, 161 N.E. 619. But neither that organization nor the practice of years in following and teaching the doctrines of the Greek Catholic Church created any trust to continue to maintain those doctrines rather than the tenets of some other denomination. Baker v. Fales, 16 Mass. 488; Stebbins v. Jennings, 10

Pick. 172; McNeilly v. First Presbyterian Church, 243 Mass. 331, 137 N.E. 691; Greek Orthodox Community v. Malicourtis, 267 Mass. 472, 480, 481, 166 N.E. 863."

 As a religious society, the Second Parish has certain inherent characteristics it cannot divest itself of. It has obligations as holder of a charitable trust and rights as a religious society. Both the obligations and the rights are implicit in the organization, and however the'written agreement is construed or whatever rights were created under it to the benefit of the plaintiff, it is certain that the plaintiff cannot claim, as arising from the agreement, by implication or otherwise, any rights inconsistent with the privileges a religious society enjoys in this State. One of those inalienable privileges is to have a minister of its own choosing. The defendant, Second Parish in the Town of Portland, is by its ancient charter a religious society with all the rights as such. It owns the house of worship in question. It is futile to say that it can hire another meeting house and worship there. The constitutional privilege is not so narrow. It would be but a technical and useless right if so construed. The right given a religious society to have its own minister means a minister in its own church, not in the street or in the building of another person. That was the construction given in the McNeilly case above referred to.

The opinion in the case of Greek Orthodox Community v. Malicourtis, 267 Mass. 472, 483, 166 N.E. 863, 867, is illuminating: "Religious societies, whether corporate or unincorporate, have the right to elect their pastors or religious teachers. Article 11, Articles of Amendment to the Constitution of Massachusetts. 'That Constitutional guaranty secures against implied restrictions the tendency to change and modification in creeds and statements of belief and affords opportunity for evolution of religious thought through freedom in choice of religious teachers. It relieves religious societies from difficulties as to interpretation of ancient forms of expression of denominational views, Smyth v. Phillips Academy, 154 Mass. 551 (28 N.E. 683), by the simple expedient of permitting them, through the usual means of the rule of the majority, freely to select their expounders of religious conceptions.' McNeilly v. First Presbyterian Church in Brookline, 243 Mass. 331, 340, 137 N.E. 691, 695."

The case has been pending some time and I think now a decree should be entered in accordance with this opinion so that an appeal may be taken.